Nash Jesus **GONZALES** and Gonzales & Gonzales, P.C., Appellants

v.

Marissa Ann **MAGGIO**, Appellee

**NO. 03-14-00117-CV**

Court of Appeals of Texas, Austin.

Filed: August 18, 2016

Thomas B. Cowart, Wasoff & Cowart, P.L.L.C., Richardson, TX, for Appellants.

C. Wilson Shirley, III, Jessica M. Hall, Savrick, Schumann, Johnson, McGarr, Kaminski & Shirley, L.L.P., Austin, TX, for Appellee.

Before Justices Puryear, Pemberton, and Bourland

## OPINION

Bob Pemberton, Justice

Appellant Nash Jesus Gonzales and appellee Marissa Ann Maggio are each Texas-licensed attorneys who were formerly partners in both marriage and law practice.[1] They divorced both maritally and professionally, and Gonzales brings appellate issues complaining of both aspects of the disunion that were addressed by the final decree. In his first of five issues on appeal, Gonzales challenges a decree provi-

---

1. During the marriage, Maggio took her husband's surname of Gonzales, and she was so identified in the final divorce decree, notice of appeal, and thus the style of the appeal when originally docketed. Because the divorce decree changed her surname to Maggio, her maiden name, and that provision is not challenged on appeal, we have updated the style of the appeal accordingly and have similarly identified her in this opinion.

sion allowing Maggio, as joint managing conservator with the exclusive right to determine the primary residence of two children of the marriage, to locate that residence anywhere within the State of Texas. Gonzales's remaining issues complain of the decree's award of interests in cases that had been originated by the Gonzales-Maggio law partnership. Gonzales is joined in this second set of issues by the entity through which he has practiced law following the dissolution of his partnership with Maggio, appellant Gonzales & Gonzales, P.C. We will affirm the decree as to the geographic restrictions but must reverse and remand, in part, the award of interests in cases.

## RESIDENCY

The trial-level proceedings were conducted in four basic stages: (1) on demand by Gonzales, a jury trial in February 2013 that ultimately resolved only contested issues of conservatorship and the children's residency;[2] (2) the district court's oral rendition of judgment on February 25, 2013, granting divorce and prescribing conservatorship and residency terms in a manner consistent with the jury's verdict; (3) presentation of further evidence to the bench concerning remaining issues, including the

dispute over interests in cases originated by the Gonzales-Maggio law partnership; and (4) finalization and ultimate signing of the final decree.[3] In the first stage, the jury found that Gonzales and Maggio should be appointed joint managing conservators.[4] In light of that finding, the Family Code required additional findings as to (1) which of the joint managing conservators should have the exclusive right to determine the children's primary residence; (2) whether a geographic restriction should be imposed on that right; and (3) if a geographic restriction should be imposed, what that geographic area should be.[5] Gonzales and Maggio each sought the exclusive right to determine the children's primary residence and advanced similarly competing positions as to whether the party so designated should be subject to any geographic restriction. Gonzales advocated limiting the children's residence to Travis County, emphasizing that the children had been born in Austin and had spent their lives there, and that it was also the base of his extended family, including sisters and cousins who had been active in the children's lives. Maggio, in contrast, urged that no geographic limitation be imposed so as to enable her to relocate with the children to the New York area, where she had grown up and that had remained the

2. *See* Tex. Fam. Code § 105.002.

3. Gonzales also filed motions for new trial that were overruled by operation of law.

4. Gonzales had requested joint managing conservatorship, while Maggio had sought sole managing conservatorship.

5. *See* Tex. Fam. Code § 153.134(b)(1) ("In rendering an order appointing joint managing conservators, the [trial] court shall: (1) designate the conservator who has the exclusive right to determine the primary residence of the child; and: (A) establish, until modified by further order, a geographic area within which the conservator shall maintain the child's primary residence; or (B) specify that the conservator may determine the child's primary

residence without regard to geographic location"); *see also id.* § 105.002(c)(1)(D)–(F) (prohibiting trial court from contravening jury's findings on, inter alia, "the determination of which joint managing conservator has the exclusive right to designate the primary residence of the child," "the determination of whether to impose a restriction on the geographic area in which a joint managing conservator may designate the child's primary residence," and "the determination of the geographic area within which the joint managing conservator must designate the child's primary residence"); *Lenz v. Lenz,* 79 S.W.3d 10, 19–21 (Tex.2002) (applying section 105.002(c)).

base of her immediate and extended family of origin. She had also obtained a law license in that state (unlike Gonzales), and claimed that professional opportunities were available to her there.

The three issues related to residency were submitted to the jury, without objection, through a succession of questions that tracked the exemplars set forth in the Texas Pattern Jury Charge. Question 2 inquired, "Which joint managing conservator should have the exclusive right to designate the primary residence of the children?," and instructed the jury to complete a blank with the name of the joint managing conservator it had chosen.[6] Question 3, in turn, inquired, "Should the managing conservator you named in Question No. 2 above be permitted to designate the primary residence of the children without regard to geographic location or with a geographic restriction?," to which the jury was instructed to indicate either "Without regard to geographic location" or "With a geographic restriction."[7] Finally, predicated on a "[w]ith a geographic restriction" finding in Question 3, Question 4 asked that the jury "[s]tate the geographic area within which the joint managing conservator must designate the primary residence of the children" by filling in a blank.[8] In answering these questions, the jury was further guided by general instructions that included, "The best interest of the child shall always be the primary consideration in determining questions of conservatorship."[9]

The jury found in Question 2 that Maggio rather than Gonzales should have the exclusive right to determine the children's primary residence. However, it found in Question 3 that Maggio's right should be subject to a geographic restriction. As for what that "geographic area" should be, the jury filled in the blank of Question 4 with an answer that neither party had advocated directly—"State of Texas." The district court rendered its decree consistent with the jury's findings, naming Gonzales and Maggio joint managing conservators and granting Maggio the exclusive right to determine the children's primary residence within the State of Texas.

 In his first issue on appeal, Gonzales challenges only the jury's finding in Question 4 that the geographic restriction to which Maggio was subject should be the boundaries of the State of Texas.[10] He reasons that "[f]rom beginning to end of the jury trial of this matter, all of the evidence and argument was directed to the children either living in Travis County or in New York (or possibly Connecticut)," not "anywhere in Texas." Consequently, Gonzales urges, the district court erred in rendering judgment based on Question 4, and he prays for a new trial of the issue.[11]

---

6. See Texas Pattern Jury Charges (Family & Probate) 216.1B (2016).

7. See id.

8. See id.

9. See id. 215.1.

10. Gonzales does not presently challenge the jury's finding in Question 2 that Maggio should have the exclusive right to determine the children's primary residence. Nor has Maggio challenged the finding in Question 3 that she should be subject to a geographic restriction.

11. During the pendency of this appeal, Maggio filed a motion to dismiss Gonzales's first appellate issue for want of subject-matter jurisdiction. She relies on intervening events. Following the jury trial and the district court's oral rendition of judgment consistent with the jury's findings, Maggio procured employment with a Dallas-area law office and moved with the children to Collin County. In that venue, Gonzales filed a motion to modify the final decree to grant him rather than Maggio the exclusive right to determine the children's primary residence. In the alternative, Gonzales prayed in his modification motion that Maggio's exclusive right under the

As an initial observation, Gonzales does not argue that the jury charge restricted the jury to the binary Travis County/Austin-versus-New York choice he proposes. To the contrary, the jury was asked simply to fill in a blank indicating "the geographic area" in which the jury found that Maggio should designate the children's primary residence, with no explicit restriction or limitation on that choice beyond requiring primary consideration of the children's best interests. Nor does Gonzales complain of any error in these portions of the charge, and with good reason—the charge, modeled on the PJC exemplars, was consistent with the underlying standard in the Family Code, which merely requires determination of a or the "geographic area" within which the children must reside.[12] This standard, as this Court has previously recognized, affords leeway to a fact-finder to eschew a choice between two opposing alternatives advocated by the parties in favor of an amalgam of the proposals instead.[13] This Court has similarly observed that the statutory framework implies broad flexibility in designating a "geographic area," including the possibility of a "geographic area" comprised of multiple counties, inasmuch as the decisional continuum would extend even to imposing no geographic limitation at all.[14]

 But a fact-finder can exercise only such leeway regarding the appropriate geographic area that the evidence supports, of course, and thus Gonzales focuses on contesting whether there was legally or factually sufficient evidence to support the jury's "State of Texas" finding. To sustain Gonzales's legal-sufficiency challenge, the record must show (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from

---

final decree to determine the children's primary residence be restricted to Collin County. Maggio insists that this alternative prayer for relief in Gonzales's modification motion is "directly contrary" to the relief he seeks in this appeal, which in her view renders his first issue "moot." Without more, we cannot agree that Gonzales's alternative prayer for relief in his modification motion, a vehicle for changing an otherwise-binding residency restriction in the original decree, renders moot his appellate challenge seeking reversal and a new trial on the underlying decree provision. *See Williams v. Lara*, 52 S.W.3d 171, 184 (Tex.2001) (justiciable controversy ceases and case becomes moot when " 'the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome' " (quoting *Murphy v. Hunt*, 455 U.S. 478, 481, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982))); *see also Heckman v. Williamson Cty.*, 369 S.W.3d 137, 162 (Tex.2012) ("Put simply, a case is moot when the court's action on the merits cannot affect the parties' rights or interests." (citing *VE Corp. v. Ernst & Young*, 860 S.W.2d 83, 84 (Tex.1993) (per curiam))). We overrule Maggio's motion to dismiss.

12. *See* Tex. Fam. Code § 153.134(b)(1)(A) ("the court shall ... establish ... a geograph-

ic area within which the conservator [who has the exclusive right to determine the child's primary residence] shall maintain the child's primary residence"); *see also id.* § 105.002(c)(1)(F) (entitlement to jury finding as to "the determination of the geographic area within which the joint managing conservator [with the exclusive right to determine the child's primary residence] must designate the child's primary residence" in event jury finds that a geographic restriction should be imposed on that right).

13. *See Deinhart v. McGrath–Stroatman*, No. 03–09–00283–CV, 2010 WL 4595708, at *5, 2010 Tex. App. LEXIS 9040, at *9–21 (Tex. App.–Austin Nov. 10, 2010, pet. denied) (mem. op.) (upholding jury finding imposing two alternative geographic restrictions that essentially combined two opposing alternative geographic restrictions advocated by the parties).

14. *Id.* at *5 n. 4, 2010 Tex. App. LEXIS 9040, at *13 n. 4 (citing *Strenk v. Strenk*, No. 03–01–00051–CV, 2001 WL 1379924, at *12–13, 2001 Tex. App. LEXIS 7495, at *38–39 (Tex. App.–Austin Nov. 8, 2001, no pet.) (mem. op.)).

giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact.[15] In making this determination, we view the evidence in the light most favorable to the jury's finding, crediting favorable evidence if a reasonable fact-finder could, and disregarding contrary evidence unless a reasonable fact-finder could not.[16] We indulge every reasonable inference that would support the finding.[17] When reviewing the factual sufficiency of the evidence, we consider and weigh all of the evidence in the record, and set aside the finding only if the evidence supporting the finding is so weak as to be clearly wrong and manifestly unjust.[18] Under either standard, we defer to the jury's credibility determinations if reasonable and do not merely substitute our judgment.[19]

The Texas Supreme Court has further instructed that the "best interest" yardstick in the child-relocation context should take account of the Family Code's policy goals of "assur[ing] that children will have frequent and continuing contact with parents who have shown the ability to act in the best interest of the child," "provid[ing] a safe, stable, and nonviolent environment for the child," and "encourag[ing] parents to share in the rights and duties of raising their child after the parents have separated or dissolved their marriage."[20] To that end, the court has identified eight non-exclusive factors that may aid the inquiry: (1) the reasons for and against the move, including the parents' good faith motives in requesting or opposing it; (2) comparisons of education, health, and leisure opportunities; (3) the degree of economic, emotional, and educational enhancement for the custodial parent and the child; (4) the effect on extended family relationships; (5) accommodations of the child's special needs or talents; (6) the effect on visitation and communication with the noncustodial parent to maintain a full and continuous relationship with the child; (7) the possibility of a visitation schedule allowing the continuation of a meaningful relationship between the noncustodial parent and the child; and (8) the noncustodial parent's ability to relocate.[21] The high court emphasized, however, that the "intensely fact driven" nature of parent-child relationships defies "bright-line" or "formulaic" tests to assess best interest.[22]

■ Informed by these considerations, we conclude that the evidence supporting the jury's "State of Texas" finding in Question 4 met the minimum thresholds of legal and factual sufficiency. While it is true that the parties at trial advocated competing sides of a Travis County-versus-New York debate, as Gonzales emphasizes, the evi-

---

15. See *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex.2005).

16. See *id.* at 807.

17. See *id.* at 822.

18. See *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986) (per curiam).

19. See *City of Keller*, 168 S.W.3d at 816–17, 819–20, 822 (legal sufficiency); *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex.2003) (factual sufficiency).

20. See *Lenz*, 79 S.W.3d at 14 (citing Tex. Fam. Code § 153.001(a)), 18–19.

21. *Id.* at 15–16; *see also Yasin v. Yasin*, No. 03–10–00774–CV, 2011 WL 5009895, *3 & n. 3, 2011 Tex. App. LEXIS 8411, *7–11 & n. 3 (Tex. App.–Austin Oct. 21, 2011, no pet.) (mem. op.) (explaining that while *Lenz* involved a motion to modify, "the factors are also applicable in an appeal of a trial court's decision regarding geographic restriction in a divorce decree").

22. See *Lenz*, 79 S.W.3d at 18–19.

dence they adduced collectively also lent support to the middle path that the jury ultimately determined to be in the children's best interests—permit Maggio to relocate out of Travis County with the children, if she saw fit, yet require that the children reside within Texas. On one hand, there was evidence that the children and Maggio would experience detrimental effects from remaining in Travis County, not only in terms of health or well-being for all three,[23] but also professionally and economically for Maggio.[24] For that matter, there was also evidence that Gonzales had at times also opined that he would benefit from leaving Travis County himself, as would occur if he were to relocate to reside near the children at a new location. But the jury also heard evidence of serious drawbacks if Maggio were permitted to move the children to far-off New York. These included complications for Gonzales in maintaining his visitation and contact with the children were he to remain in Texas. But if Gonzales instead moved to New York to remain near the children, there was evidence of economic and personal risks he would face in living far away from his extended family, community, and professional ties and in a state in which he was not licensed to practice law. Additionally, during cross-examination of Maggio, Gonzales's trial counsel attempted, with some success, to develop the themes that Maggio had given relatively superficial consideration or planning to the New York relocation she advocated and had a history of similarly toying with proposed moves to various European cities and the like. While Maggio disputed such characterizations, to be sure, the jury nonetheless could have reasonably deduced that the proposed New York destination was ultimately less critical to Maggio than having *some* location outside Travis County to which to relocate.

Viewed in the light most favorable to the jury's verdict, this evidence amounts to more than a scintilla that it was in the children's best interests to allow Maggio to relocate their primary residence beyond Travis County, but within Texas. We similarly cannot conclude that the evidence supporting this finding was so weak as to be clearly wrong and manifestly unjust. Accordingly, we overrule Gonzales's first issue.

### FEE INTERESTS

During their marriage, Gonzales and Maggio had formed a general partnership known as "Gonzales & Gonzales" (a reference to the surname they had shared at the time) (the Partnership) through which they had both practiced law. Although no written partnership agreement is in evidence, it is undisputed that the couple had agreed to share 50-50 in the Partnership's capital, profits, and losses. The Partnership's chief business was plaintiffs personal-injury work, principally auto-collision claims that tended to settle prior to suit or trial. The Partnership's standard contracts with clients provided for a "contingent-fee"

23. Our vagueness and generality here is deliberate—the tenor of the parties' custody dispute prompted an agreed order sealing the record on Gonzales's agreed motion. *See also* Tex. R. App. P. 47.4 ("If the issues are settled, the court should write a brief memorandum opinion no longer than necessary to advise the parties of the court's decision and the basic reasons for it.").

24. As explained below in connection with the fees issue, Gonzales and Maggio had both practiced plaintiffs personal-injury law, and the majority of their firm's clients had chosen to remain with Gonzales rather than Maggio after the partnership dissolved. Maggio testified to difficulty in what she characterized as restarting her legal career while remaining rooted in the same legal community and specialty as her soon-to-be ex-husband.

arrangement—if and when the Partnership obtained a recovery on the claim, it was entitled to reimbursement of any expenses it had advanced plus a percentage of the net recovery. In the event a claim escalated to litigation, the Partnership would typically obtain the assistance of co-counsel, with whom it would share contingent expense reimbursement and the percentage fee the client had agreed to pay the Partnership. When and to the extent the Partnership enjoyed a net profit on a claim, the proceeds would be split evenly between Gonzales and Maggio, and the two partners would likewise participate equally in any losses.

After the divorce litigation began, attendant acrimony prompted Gonzales and Maggio to part ways professionally as well. In a Rule 11 agreement dated May 30, 2012, Gonzales and Maggio agreed that "Marissa is no longer a partner at Gonzales & Gonzales and the partnership is dissolved." They further agreed in the Rule 11 that "[t]he liabilities of [the Partnership] and other issues pertaining to winding up the firm will be handled at a later time, most likely a final hearing." This provision, as the parties acknowledge, referenced principles of Texas law govern-

ing dissolution and termination of general partnerships, which have been codified at relevant times in the Texas Business Organizations Code. Under these requirements, the parties agree, the Rule 11 agreement "dissolved" the Partnership but did not immediately or automatically conclude the Partnership's legal existence or operations. Instead, it triggered requirements under the Code that the partners "wind up" the Partnership's business and affairs—basically discharge its existing obligations and liquidate or distribute any remaining Partnership property among the partners—"as soon as reasonably practicable." [25] During this process, a partnership's business operations continue to the limited extent necessary to wind up,[26] and the partners continue to owe duties to the Partnership and each other to act with loyalty, with care, and in good faith.[27] Only upon completion of this winding-up process does a partnership's legal existence terminate.[28]

The Partnership's matters to be wound up included its rights and duties under its contingent-fee contracts in a number of cases that had not yet been resolved by the date of dissolution.[29] Within a few

---

**25.** See Tex. Bus. Orgs. Code §§ 11.051(2) ("Winding up of a domestic entity is required on ... a voluntary decision to wind up the domestic entity ...."), .057(a) (voluntary decision to wind up a domestic general partnership not having a specific duration or purpose requires, in absence of partnership agreement providing otherwise, express will of a majority-in-interest of the partners who have not assigned their interests); see generally id. §§ 11.051–.055 (general provisions governing winding up of domestic entity), 152.701–.708 (supplemental provisions governing winding up of domestic partnership).

**26.** See id. §§ 11.052(a)(1) (upon occurrence of an event requiring winding up, entity shall "cease to carry on its business, except to the extent necessary to wind up its business"), 152.701(1) (upon occurrence of event requir-

ing winding up of partnership business, "the partnership continues until the winding up of its business is completed, at which time the partnership is terminated").

**27.** See id. §§ 152.204–.206.

**28.** See id. § 11.103 ("the existence of a nonfiling entity," which includes domestic general partnerships, "terminates on the completion of the winding up of its business and affairs").

**29.** See Bader v. Cox, 701 S.W.2d 677, 681–82 (Tex.App.–Dallas 1985, writ ref'd n.r.e.) (plurality op.) (holding that contingent-fee contracts of dissolving law firm partnership were "unfinished business" and assets of the partnership required to be wound up); id. at 688 (Whitham, J., concurring) (agreeing with that holding); see also Harris v. Harris, 765 S.W.2d

weeks after dissolution, and as contemplated by another term of the Rule 11 agreement, Gonzales and Maggio transmitted a joint letter on Partnership letterhead advising each of the Partnership's clients that Maggio had left the Gonzales & Gonzales firm "to practice as a solo practitioner"; that Gonzales was continuing to practice law under the name of "Gonzales & Gonzales, Attorneys at Law" (the predecessor to the "Gonzales & Gonzales" professional corporation (the P.C.) that is an appellant here); [30] and that the client had the right either to have Maggio "continue in her new capacity to represent you in this matter," have "the firm known as Gonzales & Gonzales, Attorneys at Law to continue to represent you," or retain "an entirely new attorney." The letter also included a form in which the client could indicate his or her choice, along with a self-addressed stamped envelope in which to return the form. The vast majority of Partnership clients opted to have the new Gonzales & Gonzales entity "continue to represent" them.

Thereafter, while their divorce litigation remained pending, both Gonzales (through either the P.C. or its predecessor partnership) and Maggio settled a number of cases that had originated with the Partnership and received expense reimbursements and attorney's-fee payments. Disputes arose concerning the respective entitlements of Gonzales, his P.C., and Maggio to these monies or similar payments that either side would receive from Partnership-originated cases in the future. To summarize their respective positions, Maggio insisted that the Partnership had retained its contingent-fee interests in these cases, such that she was entitled as equal partner to a 50% share of any net profits. The position of Gonzales and the P.C. at the trial level was somewhat inconsistent, [31] but Maggio does not dispute that they preserved a claim that the Partnership's interest had ceased in any cases in which Gonzales through the P.C. had become counsel of record. The parties' competing contentions were ultimately submitted to the district court for resolution in the proceedings that followed the jury trial. [32] By this juncture, the parties' dispute had come to focus on what were termed two

798, 803–04 (Tex.App.–Houston [14th Dist.] 1989, writ denied) (similarly recognizing that contingent-fee contract between law partnership and clients was partnership property).

While many of the case authorities we cite were decided under predecessor statutes to the Business Organizations Act, the material holdings and principles we note would apply under the Act as well.

30. Following dissolution of the Partnership, Gonzales had formed a new "Gonzales & Gonzales" partnership with his sister, also an attorney, and her affiliation was disclosed in the joint letter. Maggio had further agreed in the Rule 11 that Gonzales could have exclusive use of the Partnership's existing phone number, fax number, and websites. In August of that year, Gonzales and his sister formed the P.C. Shortly thereafter, however, the sister accepted other legal employment and relinquished her interest in the P.C., leaving Gonzales as the sole owner.

31. Both Gonzales and Maggio have had a lengthy succession of different counsel, and Gonzales was also pro se during some portions of the trial-level proceedings.

32. Initially, the dispute had taken the form of tort, contract, and equitable claims asserted by Maggio against Gonzales and the P.C., and those parties had counterclaimed with similar theories against Maggio. As the jury trial began, both sides presented evidence relevant to these claims in the evident expectation that issues would be submitted to the jury on liability and damages. However, while the record is not entirely clear as to the sequence of events, it appears that the parties agreed at some point during trial to waive the jury submissions and reserve the dispute over the Partnership-originated cases for subsequent resolution by the district court alongside the other remaining issues in the case.

"buckets" of Partnership-originated cases. "Bucket 2" consisted of thirty Partnership-originated cases that had been settled between the date of the Partnership's dissolution and the date of divorce, twenty-five of which had been handled and payment received by Gonzales post-dissolution and five of which had been handled by Maggio. "Bucket 3," on the other hand, consisted of approximately forty cases that had still been pending on the date of divorce, in thirty-three of which Gonzales was counsel or co-counsel of record, six in which Maggio was counsel or co-counsel, and the remainder having previously been referred by the Partnership to another lawyer.[33]

After hearing additional evidence relevant to these issues, the district court addressed the Bucket 2 cases in a manner yielding the result advocated by Maggio. The court awarded Gonzales and Maggio, as his or her separate property, 50% of the fees that had been earned on the Bucket 2 cases, to "be calculated after the party who advanced the out-of-pocket case expenses is reimbursed." In the event the out-of-pocket expenses to be reimbursed had been advanced by the Partnership, the court ordered that the reimbursement payment would be split 50-50 between Gonzales and Maggio. In addition to stating these awards in terms of equations or formulas, the district court awarded Maggio a lump sum of $44,815.39 to be paid her by Gonzales "for her equal share of the net proceeds" in the Bucket 2 cases. This figure corresponded to 50% of $89,630.78, a calculation presented in evidence as the difference between the total expense reimbursements and net fees Gonzales had received on Bucket 2 cases over the total amount Maggio had received.

As for the Bucket 3 cases, the district court awarded Gonzales and Maggio, as his or her separate property, percentages of any net fees ultimately earned on those cases that varied according to the level of that attorney's involvement post-Partnership dissolution. The percentages varied as follows: 60% if the attorney had retained the case following the Partnership's dissolution; 40% if the other attorney had retained the case; and 50% if the case had been referred to a third-party attorney for handling.[34] As with the Bucket 2 cases, the shares were to be calculated only after reimbursing the party who had advanced the out-of-pocket expenses, with Gonzales and Maggio each entitled to half of reimbursements of any expenses that had been advanced by the Partnership. This methodology for dividing interests in the Bucket 3 cases was similar to one that Gonzales himself had proposed at one point as a means of compensating the handling attorney for having incurred the time and effort to settle the case or other costs (e.g., overhead) that would not be recouped through reimbursement of advanced out-of-pocket expenses.[35]

█ Like other aspects of its property division, the district court's award of the

---

**33.** The parties did not dispute rights in Partnership-originated cases that had been concluded pre-dissolution, nor cases that had originated in their respective practices post-dissolution. The district court ultimately awarded Gonzales and Maggio each 100% of his or her ownership interest in their respective law firms, subject to its awards concerning the Buckets 2 and 3 cases.

**34.** In other words, if Gonzales had handled a Bucket 3 case post-Partnership dissolution, he was entitled to 60% of any net proceeds upon the case's conclusion, while Maggio would receive 40% of the net fees. The ratios were reversed for Bucket 3 cases that Maggio had handled post-dissolution.

**35.** *See* Tex. Bus. Orgs. Code § 152.203(c) (authorizing "reasonable compensation" of partners "for services rendered in winding up the business of the partnership").

interests in the Buckets 2 and 3 cases is subject to appellate review under an overarching abuse-of-discretion standard.[36] The chief contention of Gonzales and the P.C. on appeal, asserted in their second issue, is that the district court had no discretion to award interests in the Buckets 2 and 3 cases because these interests were never part of the community estate. Their reasoning begins with the observation—undisputed by Maggio—that the interests had originated as property of the Partnership, as opposed to that of Gonzales or Maggio,[37] and thus had the status of neither community nor separate property at their inception.[38] Appellants stress similarly that the interests of Gonzales and Maggio in the Partnership *entity* did not extend to rights in particular *assets* owned by the Partnership, as opposed to entitling them as partners to receive equal shares of profits and surplus.[39] Emphasizing these principles, appellants characterize the district court's decree as having purported to divide Partnership property as if part of the community estate, a clear abuse of discretion.[40]

In response, Maggio begins by pointing out that no findings of fact and conclusions of law were requested or made to elaborate on the district court's underlying reasoning for addressing the Buckets 2 and 3 cases as it did. Consequently, as Maggio correctly observes, we are to imply that the district court made any findings necessary to support the decree and uphold the decree on any legal theory the evidence supports.[41] And the decree, Maggio insists, can stand on the legal theory that the district court simultaneously (1) wound up the Partnership by distributing the Partnership's interests in the Buckets 2 and 3 cases to the partners Gonzales and Maggio individually; and (2) divided those assets, now part of the community estate, between Gonzales and Maggio. We agree that this theory can support the district court's award of fees from the Bucket 2 cases. But it is not viable with respect to the Bucket 3 cases.

■ The Rule 11 agreement in evidence explicitly contemplated that the Partnership would be wound up "most likely at a final hearing," and the parties' conduct thereafter was consistent with that expectation. This included the parties' entry into a November 2012 agreed order whereby they compiled case information that ultimately became the basis for the Buckets 2 and 3 case lists. The parties also acknowledged on the record repeatedly that their

---

36. *See, e.g., Murff v. Murff*, 615 S.W.2d 696, 698 (Tex.1981). A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without regard to guiding legal principles or supporting evidence. *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex.1998).

37. *See* Tex. Bus. Orgs. Code §§ 152.056 ("A partnership is an entity distinct from its partners."), .101 ("Partnership property is not property of the partners. A partner or a partner's spouse does not have an interest in partnership property."); *see also Harris*, 765 S.W.2d at 803–04 (recognizing that contingent-fee contract of law partnership was asset of the partnership, not of partners).

38. *See Marshall v. Marshall*, 735 S.W.2d 587, 594 (Tex.App.–Dallas 1987, writ ref'd n.r.e.)

("[P]artnership property is owned by the partnership itself and not by the individual partners. In the absence of fraud, such property is neither community nor separate property of the individual partners.").

39. *See Lifshutz v. Lifshutz*, 199 S.W.3d 9, 26–27 (Tex.App.–San Antonio 2006, pet. denied); *Marshall*, 735 S.W.2d at 593–95.

40. *See McKnight v. McKnight*, 543 S.W.2d 863, 867–68 (Tex.1976).

41. *See, e.g., Coburn v. Moreland*, 433 S.W.3d 809, 823 (Tex.App.–Austin 2014, no pet.) (citing *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex.1990)).

competing claims to interests in the Buckets. 2 and 3 cases would be addressed by the district court in connection with its division of the community estate. The district court's ensuing award of lump sums from the Bucket 2 settlements is consistent with a winding up of this portion of the Partnership's work in progress. These respective distributions, in turn, would have become part of the community estate [42] and subject to the district court's "just and right" division.[43] However, the court's disposition of the Bucket 3 cases—which, again, was in the form of percentages of future net fees under contingent-fee contracts rather than lump sums—was inconsistent with a winding up. This is so because "a partner . . . is not entitled to demand or receive from a partnership a distribution in any form other than cash" unless the partnership provides otherwise,[44] and there was no evidence of such an agreement provision here. Consequently, the decree's disposition of the interests in Bucket 3 cases had the effect of awarding Partnership property as if part of the community estate, an abuse of discretion.[45] To this extent, we sustain appellants' second issue.

■ The effect of these holdings is that the decree's award of interests in the Bucket 3 cases must be reversed and remanded for further proceedings, but the award of interests in the Bucket 2 cases would be affirmed unless it is an abuse of discretion for some other reason. The real heart of appellants' second issue—and one

having implication for both the Bucket 2 award and disposition of the Bucket 3 cases on remand—is an assertion that the Partnership's interests in both buckets had terminated when Gonzales or Maggio became counsel of record post-dissolution, leaving nothing to be wound up. Appellants' argument rests on the premise that the Partnership had withdrawn from representation in those cases through the post-dissolution joint letter to clients and the clients' subsequent selection of either Gonzales or Maggio to represent them. And by withdrawing from representation, appellants continue, the Partnership forfeited its right to recover a fee in the Bucket 2 and 3 cases as a matter of law. For the proposition that the Partnership forfeited its interests in the cases, appellants point to language in the Partnership's contingent-fee contracts stating that the client would owe "no charges for attorney's fees and costs" if "my attorney withdraws or is unable to obtain a recovery," as well as case law imposing fee forfeiture as a matter of contract or equity where an attorney, "without just cause, abandons his client."[46]

■ Appellants' arguments overlook that upon dissolution, the Buckets 2 and 3 cases were Partnership work in progress, that Gonzales and Maggio each owed duties to the Partnership and to each other to complete that work, and that each partner retained an interest in receiving any income from that work as it was completed.[47] The district court did not err or abuse

**42.** *See Lifshutz*, 199 S.W.3d at 27 (distributions from partnership are community property regardless whether in form of income or assets (citing *Marshall*, 735 S.W.2d at 594)).

**43.** *See* Tex. Fam. Code § 7.001.

**44.** Tex. Bus. Orgs. Code § 154.203(a).

**45.** *See McKnight*, 543 S.W.2d at 867–68.

**46.** *See Royden v. Ardoin*, 160 Tex. 338, 331 S.W.2d 206, 209 (1960):

**47.** *See* Tex. Bus. Orgs. Code §§ 152.204–.206; *Bader*, 701 S.W.2d at 682–83; *see also* Robert W. Hillman, *Problems and Prevention: Law Firm Management in an Era of Breakups and Lawyer Mobility: Limitations and Opportunities*, 43 Tex. Tech L. Rev. 449, 465 (2011) ("In the absence of an agreement, income derived

its discretion in impliedly finding or concluding that these rights and duties were not affected by the asserted "withdrawal" on which appellants rely. First, the joint letter advising Partnership's clients of the dissolution was not stated in terms of a withdrawal from representation for those who chose Gonzales or Maggio as counsel, but as a continuation of it—it offered clients the choice of having Maggio "*continue* in her new capacity *to represent you in this matter*" or having "the firm known as Gonzales & Gonzales, Attorneys at Law to *continue to represent you.*"[48] Nothing in the letter purported to forfeit or waive any rights of the Partnership or either partner to the fees generated by the cases. In fact, on the evidence presented, the district court could reasonably have found that neither Gonzales nor Maggio had executed any subsequent fee contract with the vast majority of Partnership clients who had opted to "continue" with either of them, leaving the relationships to be governed by the contingent-fee contract the clients had originally executed with the Partnership.[49] In any event, the post-dissolution formation of an attorney-client relationship between Partnership clients and either Maggio or Gonzales, even if accompanied by a new fee agreement omitting mention of the Partnership, would not alter the status of the cases as Partnership work in progress or the duties Gonzales and Maggio owed to the Partnership and each other in completing those cases.[50] This is so because "the right of a client to the attorney of one's choice and the rights and duties as between partners with respect to income from unfinished business are distinct and do not offend one another," as "[o]nce the client's fee is paid to an attorney, it is of no concern to the client how that fee is allocated among the attorney and his or her former partners." [51] Appellants' arguments conflate these two sets of duties. To this extent, we overrule their second issue.

from the completion of work in progress at the time of dissolution is partnership income against which all partners have a claim as the income is generated.").

**48.** (Emphases added.)

**49.** Appellants presented evidence of only a single contingent-fee contract between the P.C. and a Partnership client, and there was no proof of any such contract executed by Maggio.

**50.** *See Cofer v. Hearne,* 459 S.W.2d 877, 880–81 (Tex.Civ.App.–Austin 1970, writ ref'd n.r.e.) (in dispute between partners of dissolving law partnership over income from unfinished business, holding that letter from client of one partner purporting to "discharge" other partners "is of no materiality" because "[t]he relationship between [the client] and [her attorney] was one thing but the relationship between [the attorney] and his partners was another matter"); *cf. Bader,* 701 S.W.2d at 683 n. 5 ("Even, if a new partnership is formed, and the practice of law is, thus, continued, the surviving partners owe a[n] ...

obligation to wind up all old business of the former partnership and distribute to each partner or representative his or her pro rata share of partnership assets.").

The additional facet of *Cofer* that has drawn some criticism, relating to whether partners in a dissolving law firm are entitled to extra compensation for performing work in progress under the 1914 Texas Uniform Partnership Act, *see Kahn v. Seely,* 980 S.W.2d 794, 799 (Tex.App.–San Antonio 1998, pet. denied) (noting the criticism and rejecting *Cofer*'s holding on that point), is not implicated in the posture of this appeal.

**51.** *Jewel v. Boxer,* 156 Cal.App.3d 171, 177–79, 203 Cal.Rptr. 13 (Cal.Ct.App.1984) (also observing that a purported substitution of counsel did not change the analysis); *see also* Hillman, *supra,* at 465 (citing *Jewel* as the leading case nationally "illustrat[ing] sharing of winding up income" and as standing for "the unsurprising conclusion that income derived from cases pending on the date of dissolution is shared by all partners without regard to who performed the services generating the fees").

■ Appellants' third issue is founded upon the same basic assertions as their second issue. In their third issue, appellants insist that the district court's award of interests in the Buckets 2 and 3 cases effected (or would effect) fee-splitting in a manner that runs afoul of the Texas Rules of Professional Conduct, rendering such an award void as a matter of public policy. Appellants refer us to Rule 1.04, paragraph (f), which requires client consent to "[a] division or arrangement for division of a fee between lawyers who are not in the same firm." [52] But as previously explained, Gonzales and Maggio continued to have the relationship of partners in their Partnership (the "same firm" in terms of Rule 1.04) to the extent of winding up, and were entitled to continue receiving their respective shares of income earned during that process.[53] We cannot conclude that Rule 1.04 proscribes the enforcement of these rights and duties under Texas partnership law,[54] and overrule appellants' third issue.

In their fourth issue, appellants urge that the district court's division of the fees generated from the Bucket 2 cases lacks support in the evidence because it failed to take account of the P.C.'s interest in the cases that Gonzales had handled. This argument is predicated on appellants' view that the Partnership had ceased to have any interest in the cases once Gonzales through the P.C. or predecessor partnership became counsel of record. We have already rejected that premise. As previously explained, any fees generated by Gonzales or his entities from the Bucket 2 cases remained subject to Gonzales's preexisting duties owing to the Partnership and to Maggio during the winding-up process. We overrule appellants' fourth issue.

In appellants' fifth and final issue, appellants complain that the district court's award of interests in the Bucket 3 cases "divides future income which is not part of the community estate." As we have already reversed the Bucket 3 award, we need not reach this issue.

## CONCLUSION

We affirm the challenged portions of the decree imposing the geographic restriction on the children's residence and awarding lump sums deriving from the Bucket 2 cases. However, we reverse the award of interests in the Bucket 3 cases and remand for further proceedings consistent with this opinion.

52. Tex. Disciplinary Rules Prof'l Conduct R. 1.04(f), *reprinted in* Tex. Gov't Code, tit. 2, subtit. G, app. A (Tex. State Bar R. art. X, § 9).

53. *See* Jeffrey G. Blackwell, *The Rights of a Withdrawing Partner and the Proper Disposition of Firm Assets*, 19 J. Legal Prof. 267, 274 (1994–95) (observing similarly that the fee-splitting restriction of the Model Rules of Professional Conduct "should not be an obstacle to a division of fees among the former partners [of a dissolved partnership] according to their respective interests. The former partnership continues a fictional existence during the winding up process such that no fee division as contemplated by the Rule occurs").

54. *Cf. id.* (adding that "[t]he application of the Rule to this situation would also be contrary to the ... duties of partners in dissolution if no agreement to the contrary existed").