# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-21-00328-CV

---

**Dalith A. Regost, Appellant**

**v.**

**Julien Regost, Appellee**

---

**FROM THE 250TH DISTRICT COURT OF TRAVIS COUNTY**
**NO. D-1-FM-19-006487, THE HONORABLE AMY CLARK MEACHUM, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Appellant Dalith A. Regost complains of the trial court's decisions appointing her and appellee Julien Regost as joint managing conservators of their child L.C.R. and awarding Julien the right to determine the child's primary residence.[1] We affirm the trial court's decree.

## FACTUAL AND PROCEDURAL SUMMARY

Dalith and Julien married in August 2017, and L.C.R. was born in September 2017. The parties filed for divorce in 2019, with Julien filing in September and Dalith filing a counterpetition in October. In mid-October 2019, the trial court signed agreed temporary orders, which appointed the parents as joint managing conservators and provided that Julien would have possession from Sunday through Wednesday, that Dalith would have possession from

---

[1] Because the parties share the same last name, we will refer to them by their first names. We will refer to the child by his initials. *See* Tex. R. App. P. 9.9.

Wednesday through Sunday, and that the parents would exchange L.C.R. at the police station. The parties filed various motions asserting violations of the temporary orders, and the trial court twice signed additional temporary orders relating to Dalith withholding possession of L.C.R.

On July 21, 2020, about a week after Julien filed an amended petition seeking "primary possession," a final hearing was held, and the trial court heard testimony by Julien; Dalith; Dalith's mother, Maria Gamboa; Dalith's friend, Leticia Martinez; Child Protective Services Investigator Paul Cheever; and the parties' attorneys.[2] Julien testified about moving to the United States from Europe, entering a relationship with Dalith, and deciding with Dalith to have a child. He testified that difficulties arose due to the parents' schedules and after Gamboa came to live with them, saying that Gamboa "doesn't like me since the beginning anyway, something against—against me, and I know." He tried to improve his relationship with Gamboa, but she never liked him, and he said, "[I]t's fine for me. I mean, I don't have to be in love [with] my mother-in-law. It's okay." Julien testified that he quit his job as a pastry chef after Dalith complained that he was not making enough money. He started truck-driving school but quit when he realized it would be too difficult and when Dalith again complained that he was not making money. Julien then drove for Uber and Lyft until he was arrested in 2019 for assault causing injury to a child. Julien explained that two days before he was arrested, Gamboa and Dalith had called the police to make a similar report, but the police came to the house, checked on L.C.R., and "said, Nothing happened." Two days later, Gamboa called the police again, and when Julien arrived home, he was arrested and placed in jail. Julien later learned that while he was in jail, Dalith "call[ed] the bank and volunteer[ed] to have [his] car repossessed," offering into evidence a voluntary repossession form signed in September 2019 and testifying that at the

---

[2] Gamboa and Martinez testified through an interpreter.

2

time of the repossession, his only source of income was as a driver. Julien testified that the assault charge had been dismissed and that the allegation was false. Julien agreed that there was a charge pending against him for assault family violence against Gamboa.

After moving out of the family's house, Julien lived in an Airbnb where he had his own room and shared a bathroom. He said he had shared the house with "[p]eople who take a room at the Airbnb," explaining that "[t]he people stay two weeks, and they leave, and they have not so many people because of the COVID-19." The week of the hearing, he signed a six-month lease to move into a studio and was in the process of moving. He was moving because he wanted to "just be with [L.C.R.] in the studio, just being together and no other people." Julien testified that he had not yet received any child-support payments from Dalith, although he was not sure "how to get the child support, so I didn't really check about it." If he received child support from Dalith, Julien said, he would have more income to use towards his living situation. He was working at a restaurant, and his hours were from 3:00 a.m. to 11:30 a.m. When he has possession of L.C.R., however, "My schedule change[s]. When I have [L.C.R.], I work 9:00 a.m. to 3:00 p.m., and I put [L.C.R.] in daycare."

Julien testified that Dalith had called CPS multiple times to allege misconduct by Julien, making allegations "from the very first hearing." He denied her allegations that he had hit L.C.R. or that he had committed any sexually inappropriate behavior—saying, "No, I didn't do anything,"—and testified that she had made her allegations about him masturbating in front of L.C.R. at the hearing on temporary orders. He had dealt with three CPS investigators and had been interviewed multiple times, and "[t]hey ruled out everything." Julien also testified about Dalith's lack of cooperation with the trial court's temporary orders, saying that she did not always exchange the child as scheduled and repeatedly denied him possession, including

Christmas, Julien's birthday, and Father's Day. Julien said that as reasons for denying him possession, Dalith gave him "pretty much everything. Like the simple no to open cases with CPS," and he had had to file "multiple habeas actions to try and get her to follow the Court's order." He testified that he withheld possession once for medical reasons in March 2020. Julien explained that Dalith had told him that L.C.R. had had a fever for about a week, and when she brought the child to Julien for his possession period, L.C.R. "was not okay. He was, like, not sick, but there—something was going on, and I try to figure out what's going on. He still have fever, a lot of fever this day . . . ." When Julien changed L.C.R.'s diaper, he realized:

> on [L.C.R.'s] bottom area was like very, very bumpy, so I got—I got a little bit scared about it, and I give him Tylenol to reduce the fever. He was kind of okay. But anyway, I decide to take him to the—to the emergency room in South Austin, and they—they were really concerned about it, and they told me to go right away to the—to check in the hospital because they told me [L.C.R.] has an abscess on his bottom area. And he has to—to be—like, he had to have some surgery, and she told me—the—the doctor told me to go right away, and she even told me to use an EMS. I was, like, No, it's fine. I take my car. So I went to the hospital, and [L.C.R.] has the surgery to remove the abscess.

After surgery, Julien "went to Court to ask the judge if I can keep him until he recover, so—the judge say no. He can go back with his mom. And the same day, I just wait on [L.C.R.] until his mom complained with the judge." Julien testified that the only CPS report he had made against Dalith was related to his discovery of L.C.R.'s abscess.

Julien testified that he wanted L.C.R. to "do the child therapy and make sure he's fine" but that it had been hard to find a therapist for a child of L.C.R.'s age, particularly during the pandemic, because most therapists want to do virtual meetings. Julien testified that although L.C.R. cries at exchanges, "Most of the time he's really tired, so it doesn't really help," and Dalith "just tak[es] forever to do the exchange." Once the exchange is done, Julien said, L.C.R.

4

is back to "really happy" within "five minutes after we start talking to each other." Julien tries to keep L.C.R. on a normal schedule, the child eats well with him, and is learning French and English in addition to the Spanish he speaks in Dalith's home. L.C.R. is smiling, happy, and "perfectly fine" during Julien's periods of possession, and Julien said, "We play together. I teach him stuff. I go out with him. . . . And I enjoy with him, and he enjoy with me."

Julien was seeking primary possession because L.C.R. "needs to have his dad around him, and he loves me and I know," and because Dalith:

> refused to comply with the court order, and she also did an alienation the last time we went to court. She refused to let [L.C.R.] see me or be around me, I think it's not nice because I didn't do anything. And the CPS worker was—like ruled out everything. I want just [to] be able to—to decide for the best interest of [L.C.R.] for the school or if he has to go to hospital and everything, I do, like, take good care of him.

He testified that Dalith "don't want to co-parent with me" and had told him that he was "a bad dad" and "not a good person," including when L.C.R. was present. Julien further testified that he thought Dalith should have a restricted possession schedule "because of the alienation she did," which meant Julien had to make up missed time and "need[ed] to be with [L.C.R.] more." Julien had missed thirty-six days of possession time over a six-month period. He said that Dalith had agreed to the temporary orders "but hasn't respected it." Julien introduced into evidence letters from the Texas Department of Family and Protective Services stating that CPS had investigated and ruled out the following: an allegation by Dalith of physical abuse by Julien, ruled out in October 2019; an allegation by Dalith of neglectful supervision, physical abuse, and sexual abuse by Julien, ruled out in May 2020; and an allegation by Julien of medical neglect and neglectful supervision by Dalith, ruled out in May 2020. Cheever also testified that nine reports were made against Julien since April 16, 2020 but did not rise to the level of warranting an investigation,

5

and an additional report was filed the day before trial. He also introduced May 2020 emails between Cheever and Julien's attorney discussing whether there were any open CPS cases that might justify Dalith's withholding possession of the child—Cheever told the attorney that there were no open cases.

Dalith testified that after she and Julien married and he got his green card, she saw a "drastic change in his personality. He started, like, being mad, upset all the time. Didn't want to interact too much together as a family." Julien was "very controlling, manipulative," started monitoring her by her cellphone, told her not to go out with her friends so much, and told her she should not wear makeup. After Dalith expressed her desire for a divorce, Julien threatened to call the police if she left with L.C.R. Dalith testified that during the marriage, she had concerns about Julien injuring L.C.R. "multiple times": he once let a door slam on L.C.R.'s arm; he sometimes pushed L.C.R. with "too much force," causing him to fall; and he once put L.C.R. into a stroller "using too much force," causing the child to cry. Dalith also described an incident in which she left L.C.R.'s room and was talking to her mother in another room when she heard L.C.R. "crying, like hysterically like too much." She and Gamboa ran into the room, where they found Julien, who had been sleeping on the couch, "already there carrying [L.C.R.] like this with his face like this (indicating)." Julien told Dalith that L.C.R. had been "crying for so long" and asked why she had not come in. Dalith responded that the child had just started crying and tried to take him, but Julien "didn't want to let me see him." When Dalith finally got L.C.R., she saw "redness on his cheek"—a "red mark" that made Dalith think Julien had slapped him.

Dalith also had concerns during the marriage about Julien's "sexual tendencies around" L.C.R., explaining that Julien always wanted to be present during bath time and would "stand there and watch." On two occasions, she left to get something and came back to find

6

Julien with "his hand around [L.C.R.'s] genital area." Julien told her he was just bathing L.C.R., but she asked why he was not "using a wipe" because she was "still using wipe[s]." She said:

> It was uncomfortable, but it was too early to imagine that he was doing anything in a—in a bad way, so I let it pass. But then other incidents started happening, seeing things with [L.C.R.], like [L.C.R.] touching too much his genital area, in a way that was not appropriate for his age. Like didn't want the—the diaper changed, like his reaction to that, hitting his head. And then the most recent—the last one that kind of made me think that, yes, there's a possibility, is that I—one morning I saw—we were in the master bedroom, and at that time, we still had [L.C.R.'s] crib in—in the bedroom as well. And one morning, really early morning, I woke up and I saw Julien completely uncovered, masturbating in front of [L.C.R.] because [L.C.R.] was already awake and was sitting there watching. . . . I said, Why are you showing that to the—to this baby? And I immediately put a cover on him because he was naked. And he kind of tried to, like, make it like it was not a big deal. He was, like—I'm just scratching. I said, No, I saw what you were doing. Don't do that. Don't do that.

Dalith testified that she never told anyone about those incidents because "for my culture it's kind of like ashamed to speak things like this." She also said she agreed to the temporary orders, which gave Julien fifty-percent possession, because she "had no other option" and her lawyer at the time told her she had to accept it. Dalith stated that even at the time she accepted the orders, she did not think they were in L.C.R.'s best interest because "of the recent incidents that just happened that still were being investigated, the domestic violence cases against" Gamboa and L.C.R., and her "concerns regarding Julien's behavior," including sexual abuse. She said, "That's why I requested a—a guardian ad litem, which was—I still don't understand why was not approved, and also because I witness, like, how—how many instances of neglect from Julien to [L.C.R.]." In addition, L.C.R. had come home from time with Julien with severe diaper rash that required a doctor's visit, and she said his behavior is "different. It's kind of like he's sad, and he gets upset, and he doesn't—it takes time for him to kind of adjust again and to—to eat well." L.C.R. "doesn't want to go with his dad" and is "not comfortable

7

going with his dad," and he had begun hitting his head "with a wall or with a chair, kind of like to show that he's upset, and it kind of takes time for me just to calm him down."

Dalith admitted that she had violated the temporary orders and said it was because she was concerned about L.C.R.'s safety, apologizing to the court but saying, "[I]t's like I have no other option because I see my son is suffering." However, she also testified that she had refused Julien possession at Christmas because "I wanted for [L.C.R.] to spend Christmas on a place where he will have a Christmas tree, his presents. And I didn't know what was Julien, since he refused to tell me how—what he was doing at the Airbnb and moving too much." Dalith introduced into evidence a video showing L.C.R. crying and saying "Papa no" repeatedly while he sat in a car and testified that such behavior was common for visits "throughout the spring of this year." She said it was clear to her that L.C.R. is "terrified to go with his dad." She denied that L.C.R. had ever heard her speaking badly of Julien and testified that the child had heard Julien call Dalith names like "bitch." Dalith said she had asked Julien multiple times to enroll L.C.R. in therapy, and her attorney asserted that Julien had "objected" to that proposal.

Gamboa testified that she moved in with Dalith and Julien in June 2019. Asked what problems she saw in the family, she answered, "Well, basically, the way that [Julien] will interact with the child. Basically, he was too—he didn't have patience." He "will scold him all the time and everything was no, no. The only word that the child will hear from him was no." Julien was quiet and spoke to Gamboa very little, but "he was always upset about everything" and thought "everything in France was better." He also did not like his job, and Gamboa testified that she moved in with the family because Julien quit his job and went to Dallas to go "to a school to learn how to be a truck driver" but then "a week and a half later, he dropped it. He—he didn't like it because he told me that he would think—he thought he was not going to

8

pass the exam." Gamboa said Julien "told the school that his mother-in-law was very sick with cancer so that he didn't have to pay to finish" the course.

Gamboa testified that Julien was arrested in August 2019 because "he hit the child, [L.C.R.], and he hit me." Gamboa said that Julien "was upset because he didn't want to work for Uber anymore." She also said, "I notice when he gets mad because his face gets red. Everything about the baby will upset him." L.C.R. was pushing a chair, and Julien "was so upset that he hit the child with the chair" and then hit and pushed Gamboa "to get out of the way."

Gamboa also said that when L.C.R. was about eight months old, the baby "start touching his scrotum. It hurts kind of strong, but it was as if he was masturbating himself. And another thing that, you know, I wanted to say, because he will get scared because when he will get close to him, he will hit him." Gamboa had made reports to CPS "[b]ecause at the exchanges every time that [L.C.R.] will come back, he will have bruises, he will come very irritable, and things like that." She was asked what L.C.R. is like when he gets back from visits with Julien, and she said that it made her "very sad" because L.C.R. acts different, acts sad, and "hits himself in the head." Gamboa was asked whether earlier in the month, L.C.R. had made an outcry to her against Julien, and she said he had. At that point, Julien's attorney objected on grounds of hearsay. Dalith's attorney responded, "Your Honor, this is an outcry." The trial court stated:

> Well, you haven't done everything that's required under the Family Code. I mean, you really haven't. And so—but that said, . . . I'm going to sustain your objection, but the only thing that's going to happen now is [Dalith's attorney] will now move into the offer of proof, and so I'm sustaining your objection. She can move toward her offer of proof and then we'll go from there.

In the offer of proof, Gamboa testified that when she was changing L.C.R.'s diaper, with just the two of them in the room, L.C.R. said "[t]hat his dad had touched his

9

peepee." Gamboa was asked whether L.C.R. made any other comments in that timeframe, and she answered, "He doesn't want to be touched. I have videos that every time that he comes back from his dad, he comes back that way, that he doesn't want anybody to change his diaper."

CPS Investigator Paul Cheever explained that when a report alleging child abuse or neglect is made, "a supervisor will determine whether or not a case gets stage progressed from an intake report to an investigation" based on whether the report contains information indicating a need to investigate. He testified that CPS had investigated five reports related to L.C.R., some of which involved multiple allegations—one or two were against Dalith, and the rest were against Julien—and all the reports had been ruled out, the last one being closed in April 2020.[3] Earlier allegations were ruled out by other investigators, and Cheever had investigated several of the more recent allegations against Julien and ruled them out because "[t]here wasn't sufficient evidence to state that those allegations occurred." Cheever discussed with Dalith her allegations of sexual abuse by Julien, met with Julien, and observed both parties' homes before ruling out the allegations. He also said that "there's been several reports made, but they haven't been stage progressed to an investigation," testifying that since May 2020, the Department had received ten additional reports, none of which were found to be "sufficient to rise to an investigation." Cheever was not aware of any ongoing or active investigations at the time of the hearing, but he said CPS had received a new report the day before and he did not know "about this new one."

Cheever was asked whether he knew anything about the people who had lived in the Airbnb with Julien. Julien reported that "there was one other person, but then he said people

---

[3] Dalith and Gamboa testified that they had not made all the reports to CPS but that they had made reports or allegations to therapists or "different organizations, and they are the ones that are in charge of calling CPS." However, according to Cheever's testimony, as a result of Dalith's and Gamboa's accusations, at least fifteen reports had been made to CPS.

10

were in and out" and "told [Cheever] that he didn't know the names." Cheever's supervisor said that Cheever "did not have jurisdiction to ask them for that information since it was an Airbnb," and therefore, although Cheever was able to view Julien's residence, he was not able to investigate other people who might be staying there. Cheever said that at the Airbnb, L.C.R. slept in the same room as Julien and that there was a crib in the room for the child.

Leticia Martinez testified that she had known Dalith for about a year and had seen her with L.C.R. "many times." She said Dalith is "a mother that's always aware and watching the needs of her child" and "she puts him first, his needs, of the child." She had never seen Dalith making "a wrong decision as a mother," nor had she seen Dalith do anything dishonest. Martinez had visited Dalith's home and said it was "a very safe place, a very neat place."

After taking the case under advisement, the court sent a letter stating that it was ruling that Julien and Dalith would be appointed joint managing conservators, that Julien would have the right to designate L.C.R.'s primary residence, and that the parties would have a "one week on and one week off of 50/50" possession schedule. In April 2021, the court signed a final decree of divorce to that effect, dividing the parties' property, appointing both parents as joint managing conservators, giving Julien the right to designate L.C.R.'s primary residence, and setting out a possession schedule. On Dalith's request, the court filed findings of fact and conclusions of law stating, among other things, that "[t]he Court, in general, found [Julien] to be a credible witness"; found "portions of [Dalith's] testimony were credible and others less so"; found that Dalith was "a difficult witness at times" who had to be cautioned "to focus as a witness and answer the questions being asked"; found that Cheever "credibly testified about the numerous allegations made" against Julien by Dalith and that the allegations "had been ruled out and that there was not DFPS concern with [Julien] having possession" of L.C.R.

11

**STANDARD OF REVIEW**

Suits affecting the parent-child relationship are "intensely fact driven" and require courts to balance many factors. *Lenz v. Lenz*, 79 S.W.3d 10, 19 (Tex. 2002). "In determining issues of conservatorship and possession of a child, the primary consideration of the court is the best interest of the child," and the trial court has broad discretion to assess the child's best interest. *Coleman v. Coleman*, 109 S.W.3d 108, 110 (Tex. App.—Austin 2003, no pet.) (citing Tex. Fam. Code § 153.002; *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982)); *see In re J.J.R.S.*, 627 S.W.3d 211, 218 (Tex. 2021) ("A trial court's determination of what is in the child's best interest, specifically the establishment of terms and conditions of conservatorship, is a discretionary function."). Similarly, "[w]e review a trial court's decision to admit or exclude evidence for an abuse of discretion." *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005). A trial court does not abuse its discretion unless it acts in an unreasonable or arbitrary manner or without reference to any guiding principle, and we may not reverse for abuse of discretion merely because we disagree with the decision. *Zeifman v. Michels*, 212 S.W.3d 582, 587 (Tex. App.—Austin 2006, pet. denied); *Coleman*, 109 S.W.3d at 110.

In our review, we ask first whether the trial court had sufficient information on which to exercise its discretion and then whether it erred in its application of that discretion. *Echols v. Olivarez*, 85 S.W.3d 475, 477-78 (Tex. App.—Austin 2002, no pet.). There is no abuse of discretion "as long as some evidence of a substantive and probative character exists to support the trial court's decision." *Zeifman*, 212 S.W.3d at 587. Under an abuse-of-discretion standard, legal- and factual-sufficiency challenges "are not independent grounds of error, but are relevant factors in assessing whether the trial court abused its discretion." *Id*. "The test for legal sufficiency is 'whether the evidence at trial would enable reasonable and fair-minded people to

reach the verdict under review,'" and requires us to credit evidence favorable to the finding if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *Teal Trading & Dev., LP v. Champee Springs Ranches Prop. Owners Ass'n*, 593 S.W.3d 324, 333 (Tex. 2020) (quoting *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)). In considering factual sufficiency, we consider the entire record and "set aside the finding only if the evidence supporting the finding is so weak as to be clearly wrong and manifestly unjust." *Gonzales v. Maggio*, 500 S.W.3d 656, 662 (Tex. App.—Austin 2016, no pet.).

Whether reviewing legal or factual sufficiency, we must bear in mind that the trier of fact is the "sole judge of the credibility of the witnesses and the weight to be given their testimony." *In re P.A.C.*, 498 S.W.3d 210, 214 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). "The trial court is in the best position to observe the demeanor and personalities of the witnesses and can 'feel' the forces, powers, and influences that cannot be discerned by merely reading the record." *Echols*, 85 S.W.3d at 477 (quoting *Jeffers v. Wallace*, 615 S.W.2d 252, 253 (Tex. App.—Dallas 1981, no writ)); *see Zeifman*, 212 S.W.3d at 587 (trial court "is best able to observe the witnesses' demeanor and personalities"); *In re J.R.D.*, 169 S.W.3d 740, 743 (Tex. App.—Austin 2005, pet. denied) (trial court "is in a better position to determine what will be in the best interest of the child since it faced the parties and their witnesses, observed their demeanor, and had the opportunity to evaluate the claims made by each parent"). "In an appeal from a bench trial, findings of fact are the equivalent of jury answers to special issues," and unchallenged findings of fact are binding in our review "unless the contrary is established as a matter of law or there is no evidence to support the finding." *Morris v. Veilleux*, No. 03-20-00385-CV, 2021 WL 4341967, at *5 (Tex. App.—Austin Sept. 24, 2021, no pet.) (mem. op.).

13

**DISCUSSION**

On appeal, Dalith complains of the trial court's decisions related to testimony about an alleged outcry by L.C.R. and challenges the court's determinations that it is in L.C.R.'s best interest for both parents to be appointed joint managing conservators and for Julien to determine L.C.R.'s primary residence. Each of her issues is reviewed under an abuse-of-discretion standard. *See In re J.J.R.S.*, 627 S.W.3d 211, 218 (Tex. 2021) (best interest, particularly in matters of conservatorship); *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005) (admission of evidence); *Supakorndej v. Shang Xu*, No. 03-20-00177-CV, 2021 WL 81862, at *1–2 (Tex. App.—Austin Jan. 7, 2021, pet. denied) (mem. op.) (conservatorship); *Johnson v. Johnson*, No. 03-19-00196-CV, 2020 WL 4726589, at *10 (Tex. App.—Austin Aug. 13, 2020, no pet.) (mem. op.) (primary residence); *Coleman v. Coleman*, 109 S.W.3d 108, 110 (Tex. App.—Austin 2003, no pet.) (best interest). We will begin with Dalith's issues that relate to L.C.R.'s alleged outcry statement.

*ALLEGED OUTCRY*

Dalith argues that the trial court abused its discretion in erroneously excluding Gamboa's testimony about L.C.R.'s alleged outcry about sexual abuse, that it should have found the outcry statement to be reliable and admissible, and that the court should not have sustained Julien's hearsay objection.

Dalith asserts that L.C.R.'s "outcry statement and unusual behavior . . . are consistent with abuse as sexual indecency harmful to a child's well-being" and argues that the trial court should have found the alleged outcry to be reliable because Dalith was not present and thus could not testify about it herself; there was no indication that Gamboa had solicited the information; Dalith testified that Julien had masturbated in L.C.R.'s presence; and L.C.R. was

14

only two years old when he made the statement and thus was both capable of describing an instance of sexual indecency and "too young to fabricate such a specific statement."[4] She argues that the trial court should have found Gamboa's testimony to be reliable outcry testimony under Section 104.006 of the Family Code, which provides:

> In a suit affecting the parent-child relationship, a statement made by a child 12 years of age or younger that describes alleged abuse against the child, without regard to whether the statement is otherwise inadmissible as hearsay, is admissible as evidence if, in a hearing conducted outside the presence of the jury, the court finds that the time, content, and circumstances of the statement provide sufficient indications of the statement's reliability and:
>
> > (1) the child testifies or is available to testify at the proceeding in court or in any other manner provided for by law; or
> >
> > (2) the court determines that the use of the statement in lieu of the child's testimony is necessary to protect the welfare of the child.

---

[4] In her statement of issues presented, Dalith also lists "Issue Four" as follows: "The trial court erred by failing to make an additional finding of fact of grandmother Maria Gamboa's testimony and sexual abuse of L.C.R. by Julien against the great weight of the evidence." However, her brief does not present argument related to any omitted findings, instead arguing that the trial court should have found L.C.R.'s alleged outcry, as described in Gamboa's testimony, to be reliable and admissible. "Points of error asserted on appeal but not briefed are waived." *Smith v. Tilton*, 3 S.W.3d 77, 84 (Tex. App.—Dallas 1999, no pet.); *see* Tex. R. App. P. 38.1(i) (appellant's brief must include argument for contentions made, with citations to authority and to appellate record). Further, the trial court entered findings of fact and conclusions of law as requested by Dalith, including findings related to the parents' credibility, and she did not request further findings or otherwise complain of any omitted findings. "When a party fails to timely request additional findings and conclusions, it is deemed to have waived the right to complain on appeal of the court's failure to make them." *Howe v. Howe*, 551 S.W.3d 236, 244 (Tex. App.—El Paso 2018, no pet.); *see Hamilton v. Hamilton*, No. 02-19-00211-CV, 2020 WL 6498528, at *1 (Tex. App.—Fort Worth Nov. 5, 2020, no pet.) (mem. op.); *see also In re Marriage of C.A.S. & D.P.S.*, 405 S.W.3d 373, 381 (Tex. App.—Dallas 2013, no pet.) (untimely request for additional findings waives issue related to refusal to enter additional findings); *Goodfellow v. Goodfellow*, No. 03-01-00633-CV, 2002 WL 31769028, at *8 (Tex. App.—Austin Dec. 12, 2002, no pet.) (not designated for publication) (same). Thus, any complaints about omitted findings are waived.

Tex. Fam. Code § 104.006. She also argues that even if the testimony was not admissible under Section 104.006, it should have been admitted under one of the following hearsay exclusions:

> (2) **Excited Utterance**. A statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused.

> (3) **Then-Existing Mental, Emotional, or Physical Condition**. A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

Tex. R. Evid. 803(2), (3).

"The trial court has extensive discretion in evidentiary rulings, and we will uphold decisions within the zone of reasonable disagreement." *Diamond Offshore Servs. Ltd. v. Williams*, 542 S.W.3d 539, 545 (Tex. 2018). In determining whether an alleged outcry should be admitted, a trial court considers various "[i]ndicia of reliability," which may include:

> (1) whether the child victim testifies at trial and admits making the out-of-court statement, (2) whether the child understands the need to tell the truth and has the ability to observe, recollect, and narrate, (3) whether the other evidence corroborates the statement, (4) whether the child made the statement spontaneously in his own terminology or whether evidence exists of prior prompting or manipulation by adults, (5) whether the child's statement is clear and unambiguous and rises to the needed level of certainty, (6) whether the statement is consistent with other evidence, (7) whether the statement describes an event that a child of the victim's age could not be expected to fabricate, (8) whether the child behaves abnormally after the contact, (9) whether the child has a motive to fabricate the statement, (10) whether the child expects punishment because of reporting the conduct, and (11) whether the accused had the opportunity to commit the offense.

16

*In re M.R.*, 243 S.W.3d 807, 813 (Tex. App.—Fort Worth 2007, no pet.) (citing Tex. Code Crim. Proc. art. 38.072; *Norris v. State*, 788 S.W.2d 65, 70 (Tex. App.—Dallas 1990, pet. ref'd)). It is true that, as Dalith notes and our sister court has explained, the reliability to be assessed under Section 104.006, or its criminal equivalent Article 38.072, is "the reliability of the child's declaration, not the witness relaying the child's declaration." *Id*. (citing Tex. Code Crim. Proc. art. 38.072; *Holland v. State*, 770 S.W.2d 56, 59 (Tex. App.—Austin 1989), *aff'd*, 802 S.W.2d 696 (Tex. Crim. App. 1991)). However, that does not mean that a trial court is required to admit testimony about an alleged outcry if it determines that the witness seeking to give the testimony is not credible.[5]

On this record, whether we consider the testimony's admissibility under Section 104.006 or Rule 803, we cannot conclude that the trial court's decision to exclude Gamboa's testimony about L.C.R.'s alleged statement falls outside the zone of reasonable disagreement. *See Diamond Offshore*, 542 S.W.3d at 545. The trial court explicitly found Julien to be credible and Dalith to be less so—the court did not make any findings specific to Gamboa's credibility, and Dalith did not request any. Gamboa, who testified through a translator, had to be redirected several times to answer the question asked or to limit her answers and gave testimony that at times was inconsistent or difficult to understand. Given the trial court's credibility determinations, the possible language barrier, the tenor of Gamboa's testimony about Julien in general, Julien's testimony that Gamboa never liked him and had lied to the police and CPS about him, Cheever's testimony about the large number of reports made against Julien that were

---

[5] The vast majority of the caselaw in this area focuses on whether a trial court abuses its discretion in admitting hearsay, rather than whether it abuses its discretion in excluding it. Even if a statement could be admissible because it could be viewed as sufficiently falling under Rule 104.006 or another hearsay exception, that does not mean that the trial court was *required* to admit it—only that we would uphold its admission if the court had so decided.

17

investigated and ruled out or did not rise to the level of warranting an investigation, L.C.R.'s youth, and the substance of the alleged outcry,[6] the court did not abuse its discretion in determining that Gamboa's testimony about L.C.R.'s alleged statement was not something on which it could rely. *See P.A.C.*, 498 S.W.3d at 214 (factfinder is sole judge of credibility and weight to be given to testimony); *Echols*, 85 S.W.3d at 477 (trial court observes witnesses and "can 'feel' the forces, powers, and influences that cannot be discerned" from appellate record). We overrule Dalith's issues related to the trial court's refusal to admit Gamboa's testimony about L.C.R.'s alleged outcry.

## *FINDINGS RELATED TO CONSERVATORSHIP*

In her remaining issues, Dalith contends that the court's decisions related to conservatorship are against the great weight and preponderance of the evidence and that the evidence is legally and factually insufficient to support the court's finding that it is in L.C.R.'s best interest to appoint the parents as joint managing conservators.[7]

---

[6] Gamboa testified that L.C.R. told her that Julien "had touched his peepee." However, it is not unusual for a parent to have to touch their child's genitals, particularly a young child who wears a diaper and needs assistance bathing. And under Article 38.07 of the Code of Criminal Procedure, Section 104.006's criminal equivalent, *see In re M.R.*, 243 S.W.3d 807, 813 (Tex. App.—Fort Worth 2007, no pet.), "[t]o qualify as an outcry, 'the statement must be more than words which give a general allusion that something in the area of child abuse was going on,'" *Hines v. State*, 551 S.W.3d 771, 781 (Tex. App.—Fort Worth 2017, no pet.) (quoting *Garcia v. State*, 792 S.W.2d 88, 91 (Tex. Crim. App. 1990), and citing Tex. Code Crim. Proc. art. 38.072).

[7] Dalith also includes in her list of appellate issues challenges to the court's primary-residence determination. However, she does not brief that issue and instead subsumes it into her argument related to the court's decision to name her and Julien as joint managing conservators, apparently assuming that if we were to determine there was error in naming the parents as joint managing conservators, she would be named sole managing conservator and given the right to determine the child's primary residence. She does not present any independent

18

"It is a rebuttable presumption that the appointment of the parents of a child as joint managing conservators is in the best interest of the child," but if a trial court finds a history of family violence involving the child's parents, the presumption disappears. Tex. Fam. Code § 153.131. If the parents do not file an agreed parenting plan, the trial court may appoint them as joint managing conservators "only if the appointment is in the best interest of the child" in light of, as relevant here, whether the child's "physical, psychological, or emotional needs and development" will benefit from the appointment of joint managing conservators; the parents' ability "to give first priority to the welfare of the child and reach shared decisions in the child's best interest"; "whether each parent can encourage and accept a positive relationship between the child and the other parent"; the parents' pre-suit participation in child rearing; the geographical proximity of the parents' residences; and "any other relevant factor." *Id*. § 153.134(a). When the parents are appointed joint managing conservators, the trial court must designate one parent as having the exclusive right to determine the child's primary residence. *Id*. § 153.134(b)(1).

Dalith argues that the trial court erred in naming Julien as a joint managing conservator because of her testimony that she caught him masturbating in front of L.C.R. and that the child was acting out after his time with Julien; Gamboa's testimony that Julien threw a chair at the child and was arrested for assaulting her; both Dalith's and Gamboa's testimony that the child came home from Julien's visitations with unexplained bruises; and the fact that Julien lived in an Airbnb where other people were present. However, Dalith neglects to mention that Cheever testified about at least ten reports made to CPS—either by Dalith and Gamboa or by other agencies to whom they had made allegations of abuse by Julien—and explained that CPS

---

argument and, because we affirm the court's conservatorship decision, we thus will not reevaluate its decision that Julien should be allowed to determine L.C.R.'s primary residence.

19

investigated several and ruled them out and determined that others did not rise to the level of warranting an investigation. Further, Julien testified that he had not committed assault, had not engaged in any sexually inappropriate behavior, and had not neglected or harmed the child, while L.C.R. had required abscess surgery after Dalith's visitation period. He also testified that he had moved out of the Airbnb and into his own residence, and there was no evidence that any of the other residents of the Airbnb had harmed L.C.R.

To sustain Dalith's challenge would require us to re-evaluate the trial court's credibility assessments and its decisions related to the weight to be given to competing evidence, and we decline to do so. *See Coleman*, 109 S.W.3d at 111 ("The trial court is in a better position to determine what will be in the best interest of the children since it faced the parties and their witnesses, observed their demeanor, and had the opportunity to evaluate the claims made by each parent."); *Echols*, 85 S.W.3d at 477 ("The trial court is in the best position to observe the demeanor and personalities of the witnesses and can 'feel' the forces, powers, and influences that cannot be discerned by merely reading the record."). On this record, we cannot hold that the trial court abused its discretion in evaluating the evidence in light of the relevant factors. *See, e.g.*, *Supakorndej*, 2021 WL 81862, at *3 (affirming trial court's decision to give mother rights to determine child's primary residence and make education decisions because trial court, which must evaluate witness credibility and resolve evidentiary conflicts, "heard testimony from both parties that they had difficulties in communicating and making decisions, especially regarding their residence and where A.S. would attend school"); *Johnson v. Johnson*, No. 03-19-00196-CV, 2020 WL 4726589, at *11–12 (Tex. App.—Austin Aug. 13, 2020, no pet.) (mem. op.) (affirming trial court's decision awarding husband right to determine children's primary residence after parents produced contradicting witness testimony about behavior and respective parenting and

20

explaining that "we will not reevaluate the credibility of the witnesses or the weight to be given the evidence," and "our review is limited to ensuring that some evidence of a substantive and probative character exists to support the trial court's decision"); *Coleman*, 109 S.W.3d at 111 (observing that trial court "obviously did not find that the testimony regarding the parties' sexual activities amounted to a history or pattern of physical or sexual abuse by" husband, and because it "obviously did not find the testimony to be credible evidence of a history of sexual abuse, it was not bound by section 153.004(b)"). We overrule Dalith's challenges to the trial court's decisions to appoint both parents as joint managing conservators and to award Julien the right to determine L.C.R.'s primary residence.

## CONCLUSION

Having overruled Dalith's appellate issues, we affirm the trial court's divorce decree.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Kelly and Smith

Affirmed

Filed:  September 20, 2022

21