# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-22-00329-CV

---

**Stephen King, Appellant**

**v.**

**Acasha King, Appellee**

---

### FROM THE 126TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-FM-19-003280, THE HONORABLE MADELEINE CONNOR, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

This case involves the modification of a prior custody order. Appellant Stephen King complains of the trial court's Final Order in Suit Affecting the Parent-Child Relationship, which appointed appellee Acasha King as sole managing conservator of their children S.K. and C.K., awarded Acasha various exclusive rights regarding the children, set conditions on Stephen's visitation, and awarded Acasha attorney's fees.[1] We affirm the trial court's judgment.

### FACTUAL AND PROCEDURAL SUMMARY

Stephen and Acasha married in 2007. They have two daughters, S.K. and C.K, who were thirteen and ten years old at the time of trial. In July 2015, while residing in Colorado, they signed a joint parenting plan that set the children's primary residence with Stephen for school attendance purposes and gave both parents joint decision making over other "major

---

[1] Because the parties share the same last name, we will refer to them by their first names. We will refer to the children by their initials. *See* Tex. R. App. P. 9.9.

decisions." The plan entitled Acasha to possession every other weekend and every other Tuesday overnight. The plan also required agreement between the parents or the court's permission before either parent relocated. The couple's divorce was final in August 2015.

The witnesses at trial were Acasha, Stephen, Keshlei Bridges (monitor for Stephen's supervised visitation), Auburne Gallagher (owner of the company providing supervision), Acasha's father, and Suzan Bayar (guardian ad litem).

Acasha testified that she lived with her parents in Colorado after the divorce. Acasha testified that Stephen would often interrupt her possession of the children by picking them up during her scheduled time, which she would accommodate to appease him to avoid the "consequence" of not doing so, which she explained included him preventing her from seeing the children, "some sort of violence or retaliation," slashing her tires, or her waking up to him being in her room at her parents' house. She testified that Stephen assaulted her ten to fifteen times between when they got divorced and August of 2016 but explained that she did not call the police because she feared him. During his trial testimony, Stephen denied ever assaulting Acasha in anyway. Acasha's father testified that during the year that she lived with him and his wife in Colorado, he never saw any marks, injuries, or other evidence that she had been physically assaulted. Acasha explained that she did not tell her parents because she was embarrassed that it was happening and did not want anyone to get involved.

When asked to describe the worst incident that happened during that year following the divorce, Acasha testified that during one of the times Stephen interrupted her visitation with the children, she was putting the children in Stephen's truck, when he assaulted her and threw her in the backseat with the children. Acasha testified that she attempted to escape

2

but he caught her, hit her again, and took her to his home until he returned her to her home a day and a half later.

Acasha testified that in June 2016, Stephen appeared at the home at midnight while Acasha had possession of the children. According to Acasha's father's trial testimony, Stephen smelled of alcohol and grabbed Acasha's mother, so Acasha's father wrestled him to the ground. In a video recording, allegedly recorded immediately following that incident, Stephen threatened to move "my children" to Texas. Acasha testified that Stephen left with the children that night. Acasha testified to another incident, around the same time, when Stephen interrupted a family dinner she was having with the children and her parents. Acasha testified that he screamed and swore in front of the children and screamed that Acasha and her parents would never see "my kids" again.

Acasha testified that Stephen moved with the children to Abilene, Texas in October 2016. Acasha testified that she followed them to Texas after Stephen told her if she did not move immediately to Texas, she would never see the children again. Stephen testified that he and Acasha were friends at the time and both decided to move to Texas. Acasha testified that they all lived together with Stephen's aunt for a few months. She testified that in January 2017, the family moved to Austin, Texas. She testified that while living with the family in Austin there were multiple occasions of violence including "a physical altercation on numerous occasions" because Stephen became angry that she purchased a car for herself. She testified that during one incident while the children were in the car, she told him she was planning to purchase a different car and he strangled her and told her that "that wasn't something a good mom would do and that wasn't an appropriate car for a mom." Acasha testified that she lived with them until September 2017, when Stephen asked her to move out. She also testified that after she moved out, Stephen

3

would not allow the children to visit Acasha until he inspected her new residence. She agreed to the inspection, but Stephen told her he would never allow the girls to visit because there was a smoke smell from the neighbor's apartment and told her she could move back with him and the children. Acasha testified that she broke her lease and moved back in with Stephen and the children. Acasha testified that in September 2018, Stephen had the children tell her she had to move out.

Acasha testified that in October 2018 while she was living on her own in Austin, Stephen became angry that she went to a trivia night with her friends and missed a text from him telling her that he was in the hospital, which Acasha did not believe was true. She testified that he somehow always knew where she was and who she was talking to and would get upset if she went anywhere other than work or home. She testified that he was "very tech savvy;" that when they lived together, she would wake up to find him with her phone plugged into his computer; and that she believed he had put something on her phone that allowed him to track her. Acasha testified that around this time, Stephen began calling her regularly, berating her for long periods of time, and threatening her.

In two audio recordings of phone conversations between Acasha and Stephen from this time, which were admitted into evidence, Stephen threatened to reveal intimate photos of Acasha to her employer and potential employers in Texas if she did not move back to Colorado and never speak to the children again. In one of the recordings, he told her to never call "my daughters" again and told her she would be blocked from S.K.'s phone. In the other, he gave Acasha a two-week deadline to move before he would release the photos and he is heard speaking to the children in the background around the time he was berating Acasha for being "a sorry excuse of a mother." Stephen testified at trial that he never berated her about the trivia

4

night and never threatened to reveal intimate photos of her. After a portion of the admitted recordings was played for him, he agreed that his words sounded "like a threat to disclose intimate videos to prevent Ms. King from being able to earn a living."

Acasha testified that also around this time, in October 2018, Stephen showed up unannounced to her home and strangled her. She testified that he made her call in sick to work and held her in her home all day until she could "talk him down."

Acasha testified that the last incident of violence that Stephen committed against her was in early January 2019. She testified that when he arrived at her home with the children, he was mad, belligerent, and smelled of alcohol. She testified that the girls went into one of the two bedrooms of her small 700 square foot house and that the rooms had no doors. She testified that Stephen was mad because he thought the puppy she was watching for a co-worker was her puppy. He berated her, pushed her, strangled her, told her he hoped she died, told her she needed to return to Colorado, and pulled down the TV and the TV stand. She testified that at that point he yelled to one of the children to "look what your mom made me do." She testified that the abuse continued the next morning when he grabbed her, threw her around, hit her in the head with the puppy, and threatened to cut off her hair. She testified that while he was looking for scissors, she fled the house with the puppy. Photos of her ripped clothing, of bruises on Acasha's arm and around her eye, and of marks on her neck that she testified were caused by Stephen attacking her during this incident, were admitted into evidence. Acasha testified that she believed if she stayed that he would kill her. She explained that she did not take the children with her because she thought it would be kidnapping because of the Colorado custody order and that at that time she believed she was the only one he would hurt. During his testimony at trial, Stephen denied all of the allegations of physical violence alleged by Acasha.

5

Acasha testified that she went to Colorado after the January 2019 incident regarding the puppy and stayed for a couple weeks. She testified that she erased her phone data before getting on the plane because Stephen "always knew where [she] was going." She testified that based on security camera footage from her home in Austin, which was not entered into evidence, Stephen went to her home several times late at night and early in the morning and sent police to do a welfare check while she was in Colorado. She stayed out-of-state for three weeks because she was scared that he would retaliate against her regarding a CPS case that was opened while she was gone that she thought he would blame her for causing although she did not know how it originated.

She testified that she created a safety plan with the help of a women's support organization in Austin before returning to Texas, which included getting a new car and apartment, working from home as much as possible, wearing a wig as a disguise when she had to leave the house, taking a different route every day, and parking at a different business and getting a ride to work from there. She testified that she did not give her address to anyone. She testified that during this time she called S.K. several times, but each time Stephen would take the phone and berate her. She testified that more than once during this time Stephen left her a message that the children were in the hospital, but each time she immediately called the school and confirmed that they were in school. She testified that he showed up to her work with the children unplanned. Stephen testified that he had brought the children to her work because they had asked him if they could bring her flowers for Valentine's Day. Acasha testified that another day around this time, Stephen was seen across the street from her work in a rental truck.

Acasha testified that in late February, one of her co-workers witnessed Stephen place a tracking device on her car. Stephen testified that he did that "when she began to show an

6

interest in wanting to see the girls." Stephen pleaded guilty to placing the tracking device on her car and was on probation for that offense at the time of trial in this case. Acasha testified that she communicated to Stephen that she wanted to see the children but have no communication or contact with him.

She testified that the day before Mother's Day she called and left a message asking to have a video call with the children for Mother's Day. She testified that Stephen called her back immediately and told her details about her new car and the neighborhood she lived in. She testified that later that night, he called her and told her, "I know where you live. I know what you drive," and then she immediately heard a knock at her door. She testified that no one except her parents and sister in Colorado had her address. She testified that she called the police. The next day there was another knock at her door and she could see Stephen through the peephole. She called the police again and when they arrived, she opened the door to find a Mother's Day card in front of her door. She testified that she never got to see the children. Acasha testified that she found out from the police that the protective order she thought was in place from the tracking device incident was not in effect, so she filed for a protective order the next day. Stephen testified that the children had asked if they could get Acasha a Mother's Day card and take it to her, which they left on the rug outside her door when she did not answer.

Acasha filed a suit for a protective order from Stephen in Austin on May 15, 2019. The next day, Stephen sent a text message to Acasha's father, of which a photo was entered into evidence, which read in part, "My girls and I will be in CO soon for family and then we move to another country. . . . We won't be back to the US after this trip until Xmas and only to TX." Stephen admitted that he sent the text and testified that the country he was referencing

7

was Costa Rica. Acasha testified that around the time that Stephen moved the children to Texas he had also told her that he was going to move them to Canada.

The parties signed an Agreed Protective Order, which was signed by the trial court in June of 2019. Stephen agreed to only communicate with Acasha in writing and only about matters regarding the children, but he did "not admit or agree to any of the allegations" alleged by Acasha. The protective order included a finding that "Family Violence has occurred and is likely to occur in the future."

Acasha testified that in October 2019, Stephen violated the protective order by sending her an email that was not about the children. The resulting charges against Stephen for violating the protective order were dismissed as part of his guilty plea to the charge resulting from placing a tracking device on her car.

The protective order also provided for protected exchange of the children every other weekend at H.E.B. Acasha testified that she was there every time but that Stephen only brought the children to visitation once between June 2019 and January 2020, and on that one occurrence the children told her they did not want to see her and returned to Stephen's car.

In December of 2019, Acasha filed a petition to modify the Colorado custody order. On April 15, 2020, the parents agreed to a mediated settlement agreement, which appointed a family therapist. The trial court signed an agreed five-year protective order against Stephen and in favor of Acasha in December of 2020, which included a factual finding by the trial court that Stephen had committed family violence and that it was likely to occur in the future.

Acasha testified that in April 2021, she filed for an emergency hearing after being made aware of allegations by three of Stephen's previous girlfriends who had made various

8

allegations against him. Acasha testified that she found out that back in July 2019, Stephen had been arrested in Florida and the children had to spend the night with CPS regarding an allegation of assault against Stephen alleged by Sarah Baty, a former girlfriend of Stephen. Stephen confirmed while testifying at trial that the police had been called while he was staying at a hotel with Baty and the children had to stay with CPS overnight. Acasha also testified that she found out that Baty had gotten a protective order against Stephen. Stephen testified at trial that the allegations of assault by Baty were untrue.

Acasha testified that she also found out that another girlfriend of Stephen, Corrine Trasoff-Jilg, had accused him of assaulting her, strangling her, and holding a gun to himself and threatening suicide in March of 2021.

Acasha testified she also was aware of allegations by a third girlfriend, Jayme Fertig, of "concerning behavior involving law enforcement." Stephen testified that he was arrested in October 2020 in Round Rock, Texas for public intoxication. A video from body cam footage was played during the trial, which showed that Stephen had possession of Fertig's phone and lied to police about it before it was found in his pocket. Stephen testified that a month after that incident, Fertig accused him of assaulting her by grabbing the wheel of her car and steering into a guardrail. Stephen testified that he was trying to take over steering the car while Fertig picked up her cell phone from under her seat and that when she took control of the wheel again, she overcorrected and crashed into the guardrail. Stephen testified that Fertig later recanted her allegation of assault.

Acasha testified that the children were around these women and explained that learning about the allegations by the three girlfriends led her to change her mind that Stephen's

9

violent behavior was limited to her and that she began to believe that the children were not safe with Stephen.

The guardian ad litem testified at trial that Acasha believes that the children have witnessed at least one or two episodes of domestic violence, but that she did not find anything that supports that assertion when she spoke to the children or the therapists involved in the case. She testified that she had reviewed the CPS history from Florida—where the events alleged by Baty occurred—and that the case was ruled out and the children denied witnessing anything. She testified that the children have been very clear with her and with CPS that they had not witnessed any domestic violence. She told the trial court that both parties agree there is no physical danger to the children.

The guardian ad litem testified that she attempted to talk to Stephen's three girlfriends regarding the allegations in this case. She was unable to reach Baty. She testified that Trassoff-Jilg stated that "something did happen between the two of them" but the children were not in the home when it occurred. The guardian ad litem testified that Fertig had formally withdrawn her allegations against Stephen. She testified that when she asked Fertig, "did anything ever happen in front of the kids," Fertig answered, "no." She also testified that Fertig had only positive things to say about Stephen as a father.

In May of 2021, after a hearing, the trial court issued temporary orders appointing Acasha as temporary sole managing conservator and Stephen as temporary possessory conservator of the children. It required that Stephen's visitation be professionally supervised. A modification to this order was signed by the trial court in August of 2021 that removed the requirement that Stephen's visits be professionally supervised and allowed for an agreed third-party supervisor. It also ordered Stephen to turn over the children's passports.

10

Acasha testified that they had to switch their family therapist multiple times because Stephen voiced trust issues for himself or for the children regarding three different therapists. Acasha testified that Stephen was unsupportive of the family therapy and of her relationship with the children.

Acasha admitted that from 2015 to April 2021 when the children were primarily with Stephen, they never had any behavior problems at school, never had any issues with their peers, were generally happy children, and had excellent grades. Acasha admitted that since living with her, S.K. had started struggling in her advanced math class. Acasha testified that Stephen was on disability and had not worked since the divorce. While living in Texas he was hospitalized multiple times, and she witnessed him have seizures about once every couple weeks.

The guardian ad litem testified that the children were having a hard time with the switch to living with mom and that they had resentment towards her. She recommended an even possession split and that Stephen and Acasha be appointed full joint managing conservators where they both need to make decisions for the children jointly, which she believed would be in the children's best interest. She believed if the children were able to spend more time with Stephen, it would help their relationship with their mother. She testified that she had not seen any signs of alienation by Stephen.

On June 1, 2021 she filed her guardian ad litem report, which in part stated that "[t]he girls had not lived with their mother or spent the night with her for two years prior to April 29th, and the transition has not gone well," "[t]hese children appear to have abandonment issues as displayed by their lack of trust and feeling unsafe with their mother since she is the one who previously left them," "[e]verything these girls have learned to trust, their father, grandmother, and the family dog, has been taken away from them except for four hours once a week

11

supervised by another stranger." It also stated that Acasha "acknowledged that they worship him and are not afraid of him." When asked whether she told the guardian ad litem this, Acasha explained that she did not mean that they worshipped him in a healthy way.

The supervised visitation monitor testified that during Stephen's supervised possessions, she never felt that the visitations were in any way inappropriate or endangering regarding the children. She testified that she never heard Stephen bad mouth or say anything negative or demeaning about Acasha, but rather, that he encouraged the children to have a relationship with their mom and told them that their mom is amazing.

Acasha testified that throughout the Fall of 2021 Stephen sent her messages that were not related to the children, copies of which were entered into evidence. She testified that he had been driving the children to and from Abilene without a supervisor and without her permission. She testified that Stephen had been pushing the boundaries of the protective order and his behavior was escalating. Acasha testified that at the time of trial, late November of 2021, she had not yet received the children's passports and that Stephen had told her he could not find them. Stephen testified that at the time of trial he had only recently found them in his storage unit. Acasha testified that she had recently moved to a home that was in the children's current school district. Stephen testified that at the time of trial his house was for sale and had been on the market for about three months.

After hearing all the evidence, the district court issued its Final Order in Suit Affecting the Parent-Child Relationship, which as relevant to the challenges before us, appointed Acasha as sole managing conservator and Stephen as possessory conservator, assigned Acasha exclusive rights and duties regarding the children, created a visitation schedule for Stephen that starts with supervised visitation—by a professional supervisor or a person agreed to by the

12

parties—with the opportunity to transition into unsupervised possession of the children after a period of time and if certain conditions are met, required Stephen to pay the full cost associated with the supervised visitation, and awarded Acasha attorney's fees. The trial court found that there was credible evidence presented that there was a history or pattern of family violence committed by Stephen. This appeal followed.

## STANDARD OF REVIEW

Suits affecting the parent-child relationship are "intensely fact driven" and require courts to balance many factors. *Lenz v. Lenz*, 79 S.W.3d 10, 19 (Tex. 2002). "In determining issues of conservatorship and possession of a child, the primary consideration of the court is the best interest of the child," and the trial court has broad discretion to assess the child's best interest. *Coleman v. Coleman*, 109 S.W.3d 108, 110 (Tex. App.—Austin 2003, no pet.) (citing Tex. Fam. Code § 153.002; *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982)); *see In re J.J.R.S.*, 627 S.W.3d 211, 218 (Tex. 2021) ("A trial court's determination of what is in the child's best interest, specifically the establishment of terms and conditions of conservatorship, is a discretionary function.").

The relevant questions in a modification case are whether the circumstances of a party affected by the original order have materially and substantially changed and whether modification would be a positive improvement for the child. *In re V.L.K.*, 24 S.W.3d 338, 343 (Tex. 2000) (citing Tex. Fam. Code § 156.101(a)).[2] A trial court's order modifying a joint managing conservatorship will not be disturbed on appeal unless a clear abuse of discretion is

---

[2] Neither party challenges that the circumstances materially and substantially changed and the record supports that they had. Thus, we do not address this question. *See* Tex. R. App. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal.")

13

established by the complaining party. *Echols v. Olivarez*, 85 S.W.3d 475, 477 (Tex. App.—Austin 2002, no pet.). A trial court does not abuse its discretion unless it acts in an unreasonable or arbitrary manner or without reference to any guiding principle, and we may not reverse for abuse of discretion merely because we disagree with the decision. *Zeifman v. Michels*, 212 S.W.3d 582, 587 (Tex. App.—Austin 2006, pet. denied); *Coleman*, 109 S.W.3d at 110.

In our review, we ask first whether the trial court had sufficient information on which to exercise its discretion and then whether it erred in its application of that discretion. *Echols*, 85 S.W.3d at 477–78. There is no abuse of discretion "as long as some evidence of a substantive and probative character exists to support the trial court's decision." *Zeifman*, 212 S.W.3d at 587. Under an abuse-of-discretion standard, legal- and factual-sufficiency challenges "are not independent grounds of error, but are relevant factors in assessing whether the trial court abused its discretion." *Id.* "The test for legal sufficiency is 'whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review,'" and requires us to credit evidence favorable to the finding if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *Teal Trading & Dev., LP v. Champee Springs Ranches Prop. Owners Ass'n*, 593 S.W.3d 324, 333 (Tex. 2020) (quoting *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)). In considering factual sufficiency, we consider the entire record and "set aside the finding only if the evidence supporting the finding is so weak as to be clearly wrong and manifestly unjust." *Gonzales v. Maggio*, 500 S.W.3d 656, 662 (Tex. App.—Austin 2016, no pet.).

Whether reviewing legal or factual sufficiency, we must bear in mind that the trier of fact is the "sole judge of the credibility of the witnesses and the weight to be given their testimony." *In re P.A.C.*, 498 S.W.3d 210, 214 (Tex. App.—Houston [14th Dist.] 2016, pet.

14

denied). "The trial court is in the best position to observe the demeanor and personalities of the witnesses and can 'feel' the forces, powers, and influences that cannot be discerned by merely reading the record." *Echols*, 85 S.W.3d at 477 (quoting *Jeffers v. Wallace*, 615 S.W.2d 252, 253 (Tex. App.—Dallas 1981, no writ)); *see Zeifman*, 212 S.W.3d at 587 (stating trial court "is best able to observe the witnesses' demeanor and personalities"); *In re J.R.D.*, 169 S.W.3d 740, 743 (Tex. App.—Austin 2005, pet. denied) (observing that trial court "is in a better position to determine what will be in the best interest of the child since it faced the parties and their witnesses, observed their demeanor, and had the opportunity to evaluate the claims made by each parent"). "In an appeal from a bench trial, findings of fact are the equivalent of jury answers to special issues," and unchallenged findings of fact are binding in our review "unless the contrary is established as a matter of law or there is no evidence to support the finding." *Morris v. Veilleux*, No. 03-20-00385-CV, 2021 WL 4341967, at *5 (Tex. App.—Austin Sept. 24, 2021, no pet.) (mem. op.).

## DISCUSSION

On appeal, Stephen complains that the trial court abused its discretion in a variety of ways. In his first four issues on appeal, Stephen challenges the trial court's order creating a step-up plan for his possession that begins with supervised possession and leads to a standard possession order if he meets the court ordered requirements. In Stephen's remaining issues, he raises challenges to the trial court's family violence finding, appointment of Acasha as sole managing conservator and Stephen as possessory conservator, assignment of certain exclusive rights and duties involving the children to Acasha, and award of attorney's fees in favor of Acasha.

15

*Possession*

We first address Stephen's claims regarding limitations to his possessory rights, which include: (1) that his possession of the children be supervised for the first 18 months; (2) that the transition to unsupervised possession be contingent on Stephen being "in compliance with all civil and criminal court orders in any and all jurisdictions" and "not subject to any additional criminal allegations"; (3) that he be solely financially responsible for the costs associated with supervised visitation and that supervision must be done by either a professional supervisor or a person agreed to by both parties in writing; and (4) that his possession be limited to a standard possession order starting 36 months after the order if he is in compliance with the order.

Stephen alleges that these terms impose restrictions or limitations on his right to possession of the children that exceed those that are required to protect the best interest of the children. *See* Tex. Fam. Code §153.193 ("The terms of an order that denies possession of a child to a parent or imposes restrictions or limitations on a parent's right to possession of or access to a child may not exceed those that are required to protect the best interest of the child."). Stephen argues that the evidence was legally and factually insufficient to support that the trial court's rulings were in the best interest of the children. *See id.*

A non-exhaustive list of factors guides our review of the trial court's determination of the best interest of the children. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). The *Holley* factors are: (1) the desires of the children; (2) the emotional and physical needs of the children now and in the future; (3) the emotional and physical danger to the children now and in the future; (4) the parental abilities of the parents; (5) the programs available to assist these individuals to promote the best interest of the children; (6) the plans for the

16

children by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id.* Additional factors in modification cases are the children's needs for stability and the need to limit litigation regarding conservatorship of the children. *In re S.E.K.*, 294 S.W.3d 926, 930 (Tex. App.—Dallas 2009, pet. denied) (citing *In re V.L.K.*, 24 S.W.3d at 343). We review these factors in reviewing the evidence to determine whether legally and factually sufficient evidence supports the trial court's ruling. *See Townsend v. Vasquez*, 569 S.W.3d 796, 808 (Tex. App.—Houston [1st Dist.] 2018, pet. denied).

The first factor, the children's preferences, weighs in Stephen's favor. There was evidence presented that the children were resistant to the transition to living with their mother and expressed to Acasha that they wanted to live with their father.

The second and third factors—the emotional and physical needs of and dangers to the children now and in the future—favor Acasha. The trial court made a finding that there was credible evidence of a history or pattern of family violence committed by Stephen in the two-year period preceding the case or during the pendency of the suit.[3] *See* Tex. Fam. Code § 153.004(c) ("The court shall consider the commission of family violence or sexual abuse in determining whether to deny, restrict, or limit the possession of a child by a parent who is appointed as a possessory conservator."); *In re S.E.K.*, 294 S.W.3d at 929 ("[E]vidence of sexual abuse or family violence must be considered in determining the best interest of the children in a modification proceeding."). One alleged assault during the two-year period preceding the suit

---

[3] Stephen challenges the trial court's finding of family violence, which is addressed below.

17

was the assault regarding Acasha's co-worker's puppy during which Acasha testified, the children were present. Acasha also testified to an assault that occurred in front of the children in Colorado when he threw her into his truck with the children and held her against her will for over a day. There was also evidence of multiple interactions with police that were either in front of a child or resulted in the children having to stay with CPS overnight. There was also testimony of multiple assaults and protective orders against three other women. Further, he pleaded guilty to placing a tracking device on Acasha's car and explained at trial it was because Acasha wanted to see the children more. Stephen argues that those incidents do not pose a danger to the children because they were not in front of the children. Stephen has not provided any support for his argument that only violent and criminal behavior that occurs in front of the children poses potential emotional or physical danger to them now or in the future. Acasha also testified that at the time of trial Stephen was pushing the bounds of her protective order and she believed his behavior was escalating. The record also provides some evidence in Stephens' favor. The guardian ad litem recommended that it would be best for the children to have time with both parents and that more time with their father would improve their relationship with their mother. There was also testimony that the children felt abandoned by Acasha and that the transition to her care was difficult.

The fourth factor, the parental abilities of the parents, is neutral. There was testimony favorable to both parents' ability and concerns raised. The guardian ad litem recommended an even split of possession. The guardian ad litem testified that a CPS investigation found that both homes were safe. The guardian ad litem testified that Stephen was a good father. There was evidence presented that the children had good grades and a routine

18

while living with their father. There was also testimony that while living with their mother, the children wanted their father, but not mother, at their extracurricular activities.

The fifth factor—programs available to assist these individuals to promote the best interest of the children—favors Acasha. Acasha testified that Stephen was unsupportive of therapy, which was intended to ease the transition of Acasha having possession of the children again.

The sixth factor, the plans for the children by the parents, and the seventh factor, the stability of the home, favors Acasha. The record reflects that at the time of trial, Acasha and Stephen were both living in the children's school district. However, Stephen's house was for sale. The evidence also suggested that Stephen had previously used moving with the children as a threat against Acasha, had sent a text to Acasha's father that stated he was moving to another country and was not planning to come back for about six months, and had not given the children's passports to Acasha as ordered by the trial court because he claimed he could not find them until just before trial. Acasha testified that he did not ask her about the move to Texas. Stephen testified it was their joint plan to move to Texas.

The eighth factor, the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, favors Acasha. Acasha testified that she believed the children worship Stephen in an unhealthy way and that Stephen used the children to manipulate her. Specifically, she testified that after the puppy incident she did not disclose her address to anyone, but Stephen showed up to her work with the children and left flowers and showed up to her house with the children and left a Mother's Day card. Acasha's testimony also included descriptions of multiple times that Stephen interfered with Acasha's visitation under previous orders, including: by only bringing the children to one visitation under the first custody

19

order in this case; by setting additional requirements than the Colorado custody order required such as inspecting her residence and vetoing visitation at the residence; by requiring her to move to Texas to continue to see the children; by threatening to expose intimate photos of her to employers if she did not move back to Colorado and not contact the children again; by committing acts of violence against her that caused her to flee for her safety, which created a strained dynamic between her and her children; and by being unsupportive of the family therapy that was intended to ease the transition to Acasha having regular custody. Additionally, there was substantial evidence presented that supports Acasha's testimony, including photos of Acasha's ripped clothing and bruises after the puppy incident, the admitted recordings of Stephen threatening to reveal intimate photos of Acasha if she did not move out of state and cease speaking to the children, Stephen pleading guilty to placing a tracking device on her car after she expressed interest in seeing the children, the incident with CPS, his arrest for public intoxication, and the protective orders against him.

In favor of Stephen, the visitation supervisor testified that his visitations were appropriate. The guardian ad litem testified that there were no signs that he alienated the children from Acasha. Stephen denied that he assaulted Acasha in any way and that Acasha abandoned the children leaving him as the sole caregiver for extended periods of time. Acasha admitted that she left the children with Stephen after the puppy incident.

The ninth factor, considering any excuse for the acts or omissions of the parent, favors Acasha. Acasha explained that she fled after the puppy incident without the children because she thought at that time that Stephen was only hurting her and she believed taking the children would violate the Colorado custody Order.

20

Out of the nine factors, only one weighs in favor of Stephen. The additional factors, the children's needs for stability and the need to limit litigation regarding conservatorship of the children, also weigh in favor of Acasha. *See In re S.E.K.*, 294 S.W.3d at 930. Acasha testified in detail to how Stephen had interrupted, prevented, or otherwise negatively impacted her visitation of and relationship with the children, which resulted in this suit. The evidence is neither legally nor factually insufficient to support the trial court's restrictions that were placed for the best interest of the children. *See Townsend*, 569 S.W.3d at 813 (holding evidence factually and legally sufficient to support best interest of child determination when only one factor weighed in favor of appellant).

Concluding that the evidence was factually and legally sufficient to support the trial court's finding, we next consider whether it was an abuse of discretion. *Echols*, 85 S.W.3d at 477–78. We must determine whether, based on the elicited evidence, the trial court made a reasonable decision, which is one that was neither arbitrary nor unreasonable. *Id.* at 478.

Based on all the evidence discussed in our above *Holley* analysis, the trial court's step-up plan was not arbitrary nor unreasonable. *See Zeifman*, 212 S.W.3d 587. The trial court had "the authority to determine the frequency and duration of visits, as well as the limitations and safeguards to be placed on such visits." *In re L.M.M.*, No. 03-04-00452-CV, 2005 WL 2094758, at *9 (Tex. App.—Austin Aug. 31, 2005, no pet.) (mem. op., not designated for publication). Considering the evidence regarding Stephen's escalating violent, harassing, and manipulative behavior, combined with the testimony that his supervised visitations had been appropriate, it was not an abuse of discretion for the trial court to order supervised visitation. Supervised visitation is a reasonable condition to be ordered to address potential safety concerns. *In re E.N.C.*, No. 03-07-00099-CV, 2009 WL 638188, at *18 (Tex. App.—Austin Mar. 13, 2009,

21

no pet.) (mem. op.). Another option is to order a step-up in possession provided that the parent comply with specific requirements of the court's order. *In re L.M.M.*, 2005 WL 2094758, at *10 (holding that trial court did not abuse its discretion by ordering step-up possession schedule for mother that started with supervised visitation and then moved to standard possession order after six months of therapy). A trial court may also determine that a standard possession order rather than an even split of possession is in the best interest of the children. *See Garza v. Garza*, 217 S.W.3d 538, 552 (Tex. App.—San Antonio 2006, no pet.) (trial court did not abuse its discretion by decreasing mother's weekly possession with children when, even though mother was good and loving parent, there was evidence she exhibited difficulty thinking logically and coherently and that she had problems involving rage episodes, mood fluctuations, and impulsive and unpredictable behavior; and father would provide a more stable, consistent, and safe environment.)

The step-up plan and conditions address the safety concerns raised by Stephen's history of violent and criminal behavior by increasing visitation and removing the requirement of supervision if Stephen can refrain from committing additional criminal offenses and comply with the protective orders against him. It also addresses concerns raised by Stephen's behavior that interfered with Acasha's visitation under previous orders. The temporary period of supervised visitation, the step-up plan, and the conditions of lawful behavior are not arbitrary or unreasonable considering the record in this case. *See Zeifman*, 212 S.W.3d 587. The trial court did not abuse its discretion in setting these restrictions on Stephen's possession of the children. *See* Tex. Fam. Code § 156.101 (a) ("The court may modify an order . . . that provides for the possession of or access to a child if modification would be in the best interest of the child."). Stephen has not established that the challenged terms of the order impose restrictions or

22

limitations on his right to possession that exceed those that are required to protect the best interest of the child. *See id.* §153.193.

We overrule Stephen's first four issues.

*Finding of Family Violence*

Stephen argues that there was legally and factually insufficient evidence to support the trial court's finding of family violence in the two years prior to the filing of the suit or during the pendency of the suit, because he denied the allegations that he assaulted Acasha in any way and because Acasha's father testified that he did not see any evidence that she had been assaulted during the year she lived with him.

"Family violence" as defined by the Texas Family Code is:

> an act by a member of a family or household against another member of the family or household that is intended to result in physical harm, bodily injury, assault, or sexual assault or that is a threat that reasonably places the member in fear of imminent physical harm, bodily injury, assault, or sexual assault, but does not include defensive measures to protect oneself.

Tex. Fam. Code § 71.004; *see also id.* § 101.0125 (applying definition in section 71.004 to suits affecting parent-child relationship).

Acasha testified that Stephen assaulted her on two different occasions by strangling her in her home in Texas during the two-year period prior to the filing of the suit. Acasha presented photographs of her ripped clothes and bruises that she testified were from the most recent incident of assault, which involved a co-worker's puppy and the children present in the house. The trial court's finding is also supported by the issuance of two protective orders issued by the trial court against Stephen to protect Acasha. *See* Tex. Fam. Code § 153.004 ("In

23

determining . . . whether there is credible evidence of a history or pattern of past or present . . . family violence by a parent or other person, as applicable, the court shall consider whether a protective order was rendered . . . against the parent or other person during the two-year period preceding the filing of the suit or during the pendency of the suit.")

Stephen argues that the protective orders do not provide support for a finding of family violence because Stephen agreed to the protective orders but denied any of the allegations contained within. However, both protective orders include an explicit factual finding by the trial court that family violence occurred and is likely to occur again. Thus, Stephen's conditional agreement to the protective orders does not render them irrelevant for purposes of supporting the trial court's ultimate determination that family violence had occurred.

Stephen's arguments that he denied the allegations and that Acasha's father did not witness evidence of the assaults merely attack the trial court's resolution of conflicting evidence. *See Zeifman*, 212 S.W.3d at 587 (trial court "is best able to observe the witnesses' demeanor and personalities"). The trial court could have reasonably credited Acasha's testimony over Stephen's denials. It also could have resolved Acasha's and her father's testimony by believing Acasha's testimony that she did not want her family to know about the abuse because she was embarrassed and did not want them involved. Additionally, the period of time that Acasha lived with her father is not the same period of time in which the trial court found family violence had occurred. Crediting the evidence favorable to the finding we hold that it is legally sufficient to support the trial court's finding of family violence. *Teal Trading & Dev., LP*, 593 S.W.3d at 333. In considering the entire record we hold that the evidence is factually sufficient as the evidence in support of the finding is not "so weak as to be clearly wrong and manifestly unjust." *See Gonzales*, 500 S.W.3d at 662. Nor is the finding of family violence an

24

abuse of the trial court's discretion as it was not unreasonable, arbitrary, or without reference to any guiding principle. *Zeifman*, 212 S.W.3d 587. We overrule Stephen's fifth issue.

*Mother as Sole Managing Conservator and Father as Possessory Conservator*

In his sixth through eighth issues, Stephen alleges that the trial court abused its discretion in appointing Acasha as the sole managing conservator of the children and granting her exclusive rights regarding the children.

A trial court is prohibited from appointing "joint managing conservators if credible evidence is presented of a history or pattern of past or present . . . physical . . . abuse by one parent directed against the other parent . . . . Tex. Fam. Code § 153.004(b). The trial court's finding that there was a history of family violence prohibited the court from naming Stephen as a joint managing conservator. *Id.*

A sole managing conservator will have the exclusive right to make decisions concerning the children unless limited by a court order. *Id.* § 153.132. These rights include determining the child's primary residence; making educational, health, and financial decisions; and managing passports. *Id.* The trial court awarded these exclusive rights to Acasha. A trial court may award one parent exclusive decision-making rights when there is evidence that the parents have difficulty communicating and making decisions. *See Supakorndej v. Xu*, No. 03-20-00177-CV, 2021 WL 81862, at *3 (Tex. App.—Austin Jan. 7, 2021, pet. denied) (mem. op.). Here, there was evidence that Stephen regularly engaged in inappropriate communication with Acasha, including violating the protective order by communicating with her about matters not regarding the children, the charges of which were dismissed when he pleaded guilty to placing a tracking device on her car.

Further, considering the evidence and *Holley* factors detailed above, the evidence is neither legally nor factually insufficient to support that the trial court's conservatorship decisions were in the best interest of the children. *See Teal Trading & Dev., LP*, 593 S.W.3d at 333; *Gonzales*, 500 S.W.3d at 662. Nor is the finding an abuse of the trial court's discretion as it is not unreasonable, arbitrary, or without reference to any guiding principle. *See Zeifman*, 212 S.W.3d 587; *In re L.C.L.*, 396 S.W.3d 712, 719 (Tex. App.—Dallas 2013, no pet.) (concluding that trial court did not abuse its discretion when it appointed father as sole managing conservator of child where trial court made affirmative finding that there was history of family violence by mother); *Johnson v. Johnson*, No. 03-19-00196-CV, 2020 WL 4726589, at *10 (Tex. App.—Austin Aug. 13, 2020, no pet.) (mem. op.) (holding trial court did not abuse its discretion when it awarded father exclusive rights when the record supported that mother had physically assaulted father, involved the children in disputes with father, acted in a hostile and aggressive manner toward father, and did not communicate positively or cooperate in making decisions for the children).

We overrule Stephen's sixth through eighth issues.

*Attorney's fees*

In his ninth issue, Stephen challenges the trial court's order awarding Acasha $62,662.77 in attorney's fees. Stephen argues that Acasha did not present sufficient evidence to prove her attorney's reasonable hours worked and reasonable rates. Acasha asserts that the attorney billing records entered into evidence and her attorney's testimony regarding her hourly rate, and the rate of her paralegal is sufficient evidence of the particular services performed, who performed them, when the services were performed, the reasonable amount of time required to

26

perform the services, and a reasonable hourly rate as required by *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 501–02 (Tex. 2019).

In a suit affecting the parent-child relationship, the court may award reasonable attorney's fees, expenses, and costs. *See* Tex. Fam. Code §§ 106.001, .002. "A 'reasonable' attorney's fee 'is one that is not excessive or extreme, but rather moderate or fair.'" *Sullivan v. Abraham*, 488 S.W.3d 294, 299 (Tex. 2016). We review a district court's order awarding attorney's fees for a clear abuse of discretion. *Sparks v. Rutkowski*, No. 03-17-00452-CV, 2018 WL 3799940, at *2 (Tex. App.—Austin Aug. 3, 2018, no pet.) (mem. op.). A district court abuses its discretion when it acts arbitrarily, unreasonably, without regard to guiding rules or principles, or without supporting evidence. *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998).

"[A] claimant seeking an award of attorney's fees must prove the attorney's reasonable hours worked and reasonable rate by presenting sufficient evidence to support the fee award sought." *Rohrmoos*, 578 S.W.3d at 501–02. "Sufficient evidence includes, at a minimum, evidence of (1) particular services performed, (2) who performed those services, (3) approximately when the services were performed, (4) the reasonable amount of time required to perform the services, and (5) the reasonable hourly rate for each person performing such services." *Id.* at 502.

Here, Acasha's attorney, Stephanie McFarland, presented invoices that itemized the particular services performed, who performed those services, what day they were performed on and how long it took to perform the services, and the hourly rate for each person performing such services. Further, McFarland testified that she has been continuously practicing law for over twenty years, that her hourly rate was $300 per hour, that she was working with a board-certified paralegal, and that their total fees were $67,662.77. She explained that there

27

were case specific facts that support that the fee amount was reasonable, which included: that there was a guardian ad litem; the allegations of domestic violence, which she testified requires specialized training and experience to handle; that there were numerous professional therapists, supervisors and other people involved in the case; that the case required emergency hearings and emergency orders; and that the criminal allegations against Stephen created ongoing changes to the circumstances of the case.

Stephen does not specify how the trial court's award of attorney's fees was not reasonable. The record reflects that McFarland presented the trial court with detailed invoices and that she testified to her experience and the experience of her paralegal and to the specific facts of the case that required the amount of time and services that were performed. The invoices and McFarland's testimony are legally and factually sufficient to support the court's award of $62,662.77 in attorney's fees to Acasha. *See Sparks*, 2018 WL 3799940, at *4 ("The district court has wide discretion in awarding reasonable attorney's fees under section 106.002 of the Family Code."). Considering the entire record and applying the factors set out in *Rohrmoos Venture*, 578 S.W.3d at 494, we cannot conclude that the trial court abused its discretion in its award of attorney's fees to Acasha. *See Sparks*, 2018 WL 3799940, at *2. We overrule Stephen's ninth and final issue regarding attorney's fees.

## CONCLUSION

Having overruled Stephen's appellate issues, we affirm the trial court's order.

_____

Darlene Byrne, Chief Justice

28

Before Chief Justice Byrne, Justices Triana and Theofanis

Affirmed

Filed:   June 8, 2023